# EXHIBIT A

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 MAY 13  PM 4: 20

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| DRYWALL ACOUSTIC LATHING AND INSULATION LOCAL 675 PENSION FUND, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MOLSON COORS BREWING COMPANY, PETER H. COORS, W. LEO KIELY III, CHARLES M. HERINGTON, FRANKLIN W. HOBBS, RANDALL OLIPHANT, PAMELA PATSLEY, WAYNE SANDERS, ALBERT C. YATES, TIMOTHY V. WOLF, PETER SWINBURN, DAVID G. BARNES and PETER M.R. KENDALL, <br><br> Defendants. | CIVIL ACTION NO.  0 5 - 2 9 4 <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings, as well as regulatory filings and reports, securities analysts' reports and advisories about the matters alleged herein, press releases and other public statements and media reports about the matters alleged herein, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.      This is a federal class action brought on behalf of a class (the "Class") comprised of: (i) former shareholders of Molson Inc. ("Molson") who received shares of Molson Coors Brewing Company ("Molson Coors" or the "Company") as a result of the February 9, 2005 merger of Molson by and into the Adolph Coors Company ("Coors"); (ii) open market purchasers of the common stock of Coors from July 22, 2004 to February 9, 2005, inclusive; and (iii) open market purchasers of the common stock of the Company, following completion of the merger between Molson and Coors on or about February 9, 2005 to April 27, 2005, inclusive, and who were damaged by the decline in the Company's stock. Plaintiff is seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). "Class Period" refers to the period July 22, 2004 to April 27, 2005. This Complaint alleges that during the Class Period, defendants issued materially false and misleading statements of fact to the market in press releases and SEC filings. False and misleading representations were also contained in the joint Proxy Statement / Prospectus, filed on or about December 10, 2004, pursuant to Schedule 14A.[1]

2.      On or about February 9, 2005, Coors and Molson merged to form Molson Coors, a corporation registered and organized under the laws of the state of Delaware (the "Merger"). The Merger of Molson and Coors was structured as a stock-for-stock merger and, therefore, required shareholder approval. To obtain such approval from shareholders, defendants stated that the Merger would result in synergies and cost savings, and that the combination of Coors and Molson would result in a substantially stronger and more profitable Company.

3.      For shareholders of Molson who were asked to vote to ratify the Merger, and purchased Coors and/or Molson Coors stock during the Class Period, the purported financial

---

[1]      Unless otherwise indicated the term Proxy Statement/Prospectus refers to the Proxy/Prospectus, filed with the SEC on or about December 10, 2004, which was amended on or about January 21, 2005.

strength and operational capacity of Coors was especially important because, before the Merger, Molson had consistently reported that it was operating below plan, and that it would achieve growth consistent with previous guidance. Coors consistently stated that the below-plan performance of Molson prior to the Merger was *not* a surprise, and would *not* adversely impact the combined Company's performance. Investors were thus led to believe that the financial and operational strength of Coors, and synergies from the Merger, would enable the Company to reach its projected goals, despite Molson's poor pre-merger performance.

4.      It was only on April 28, 2005, however, when defendants released the combined Company's first quarterly financial results, that investors learned the truth about the impaired financial and operational condition of Coors, including the following:

- At the time the Merger closed on or about February 9, 2005, which was well into the first fiscal quarter of 2005, Coors was not operating according to plan and had experienced material adverse changes in its business.

- At the time of the Merger, defendants had violated the terms of the Merger Agreement and Proxy/Prospectus by failing to disclose that Coors's business was being, and foreseeably would continue to be, adversely impacted by conditions that were causing Coors to perform well below plan and consensus estimates.

5.      Defendants concealed these material facts because it enabled them to effectuate the Merger in a manner that allowed the relatives and heirs of the Coors Molson families to dominate the combined Company. Specifically, as a result of defendants' plan and illegal course of conduct, the Coors and Molson family members, who together owned significantly less than a majority of the outstanding shares of the combined Company, were able to prevent the acquisition of each company by another entity and were, thereafter, collectively able to nominate at least 10 of the Company's 15 Board members.

6.      As a result of defendants' illegal and improper conduct, as detailed herein, members of the Class have been damaged, and continue to sustain damages.

3

7.    It was only weeks after the close of the Merger that shareholders of the Company learned that Coors was operating well below plan. On April 28, 2005, before the open of trading, defendants published a release announcing disappointing results for the Company's first quarter of 2005.

8.    Immediately following publication of this release, shares of the Company fell precipitously, almost $14.50 per share, to $63.00 per share, a decline of almost 20%, a testament to investors' surprise and disappointment in the results.

## JURISDICTION AND VENUE

9.    Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under and pursuant to Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") and Sections 10(b) and 20(a) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), and 78t(a), and Securities and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. [17 C.F.R. § 240.10b-5].

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. §78aa].

11.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), §1337 and §27 [15 U.S.C. §78aa].

12.    In addition to the foregoing, venue is also proper in this District because many of the acts and practices complained of herein also occurred in substantial part in this District. The Company is incorporated under the laws of Delaware and has enjoyed the benefits and protections of incorporation in Delaware.

13.   In connection with the acts alleged in this complaint, defendants also, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and interstate transportation facilities.

**PARTIES**

14.   Plaintiff Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, as set forth in the accompanying certification, incorporated by reference herein, received shares of the Company in or traceable to the Merger of Molson with and into the Company, and has been damaged by the subsequent decline in the price of the Company's stock following defendants' belated disclosures, as particularized herein.

15.   Defendant **MOLSON COORS BREWING COMPANY** is a corporation organized under the laws of the state of Delaware with its principal place of business located at 311 Tenth Street, Golden, Colorado, and with its Canadian executive offices located at 1555 Notre Dame Street East, Montreal, Quebec, Canada.  Molson Coors Brewing Company, formerly Adolph Coors Company, is a holding company engaged in the manufacturing, marketing and selling of malt beverage products through its principal subsidiaries, Coors Brewing Company, operating in the United States, and Coors Brewers Limited, operating in the United Kingdom. On February 9, 2005, Adolph Coors Company merged with Molson Inc.  In connection with the Merger, Adolph Coors Company became the parent of the merged company and changed its name to Molson Coors Brewing Company. Molson sells its beer in Canada, Brazil and the United States. Molson has five breweries in Canada and eight breweries in Brazil, and distributes over 75 owned or licensed brands of beer and alcohol products.

16.   Defendant **PETER H. COORS** ("P. Coors") was, during the Class Period, Chairman of the board of directors of Coors.  P. Coors was instrumental in negotiating the

5

Merger of Molson by and into the Company, and in the preparation, ratification and filing of the Proxy/Prospectus.

17.    Defendant **W. LEO KIELY III** ("Kiely") was, during the Class Period, President, Chief Executive Officer and a member of the board of directors of Coors. Kiely was instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus.

18.    Defendant **CHARLES M. HERINGTON** ("Herington") was, during the Class Period, a member of the board of directors of Coors. Defendant Herington was instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus.

19.    Defendant **FRANKLIN W. HOBBS** ("Hobbs ") was, during the Class Period, a member of the board of directors of Coors. Hobbs was instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus.

20.    Defendant **RANDALL OLIPHANT** ("Oliphant") was, during the Class Period, a member of the board of directors of Coors. Oliphant was instrumental in negotiating the Merger, and in the preparation, ratification and/or filing of the Proxy/Prospectus.

21.    Defendant **PAMELA PATSLEY** ("Patsley") was, during the Class Period, a member of the board of directors of Coors. Patsley was instrumental in negotiating the Merger of Molson by and into the Company, and in the preparation, ratification and filing of the Proxy/Prospectus.

22.    Defendant **WAYNE SANDERS** ("Sanders") was, during the Class Period, a member of the board of directors of Coors. Sanders was instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus.

6

23.    Defendant **ALBERT C. YATES** ("Yates") was, during the Class Period, a member of the board of directors of Coors. Yates was instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus.

24.    Defendant **TIMOTHY V. WOLF** ("Wolf") was, during the Class Period, Vice President and Chief Financial Officer of Coors, Global. Defendant Wolf was instrumental in negotiating the Merger and in the preparation and filing of the Proxy/Prospectus.

25.    Defendant **PETER SWINBURN** ("Swinburn") was, during the Class Period, President of Coors Brewing Worldwide. Swinburn was instrumental in negotiating the Merger and in the preparation and filing of the Proxy/Prospectus.

26.    Defendant **DAVID G. BARNES** ("Barnes") was, during the Class Period, Vice President, Finance and Chief Financial Officer, Coors U.S Brewing Company. Barnes was instrumental in negotiating the Merger, and in the preparation and filing of the Proxy/Prospectus.

27.    Defendant **PETER M.R. KENDALL** ("Kendall") was, during the Class Period, Chief Executive Officer, Coors Brewers Limited. Kendall was instrumental in negotiating the Merger, and in the preparation and filing of the Proxy/Prospectus.

28.    The individual defendants identified above are referred to collectively herein as the "Individual Defendants."

29.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the true operational and financial condition of Coors in the period immediately prior to the close of the Merger, *via* access to internal corporate documents (including the Coors's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers

7

and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

30.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers and/or directors of Coors, by virtue of their high-level positions with Coors, directly participated in the management of Coors and/or the Company, was directly involved in the day-to-day operations of Coors and/or the Company at the highest levels and was privy to confidential proprietary information concerning Coors and/or the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly and/or negligently disregarded, that the false and misleading statements were being issued regarding Coors and/or the Company, and approved or ratified these statements, in violation of the federal securities laws.

31.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to Coors and/or the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue,

8

so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the relevant period violated these specific requirements and obligations.

32.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly and/or negligently disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Coors and/or the Company, each of the Individual Defendants had access to the adverse undisclosed information about Coors's true operational and financial condition immediately prior to the Merger, and the impact this would foreseeably have on the Company following the Merger, as particularized herein, and knew or recklessly and/or negligently disregarded that these adverse facts rendered the positive representations made by or about Coors, the Company, and its business issued or adopted by the Company, materially false and misleading.

33.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to Coors and/or the Company during the relevant period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

9

34.     Each of the defendants is liable as a participant in a course of conduct that operated as a deceit on those who acquired shares of the Company pursuant to the materially false and misleading Proxy/Prospectus, by disseminating materially false and misleading statements and/or concealing material adverse facts about Coors prior to the Merger. The scheme: (i) deceived the investing public regarding the combined Company's business, operations, management and the intrinsic value of Coors and the Company's common stock; (ii) caused former shareholders of Molson to surrender their shares in a purported merger of equals, when, in fact, defendants had withheld material information, and omitted to disclose material adverse facts about Coors, prior to the consummation of the Merger; and (iii) caused plaintiff and other members of the Class to surrender their Molson shares in exchange for shares of the Company, at artificially inflated prices and/or without full and adequate consideration.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of (i) former shareholders of Molson who received shares of the Company as a result of the February 9, 2005 merger of Molson by and into Coors; (ii) open market purchasers of the common stock of Coors from July 22, 2004 to February 9, 2005, inclusive; and (iii) open market purchasers of the common stock of the Company, following completion of the merger between Molson and Coors on or about February 9, 2005 to April 27, 2005, inclusive, and who were damaged by the decline in the Company's stock. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

10

36.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by defendants' acts as alleged herein;

b.     whether statements made by defendants to the investing public during the relevant period misrepresented material facts about the business, operations and management of the Company; and

c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

11

40.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS
## DEFENDANTS WRONGFUL CONDUCT

41.    **Background: The Pre-Merger Companies - Molson Inc.** Prior to the Merger, Molson was Canada's largest brewer and one of the world's leading brewers of beer, with operations in Canada, Brazil and the United States. Founded in 1786, Molson also was North America's oldest beer company, and one of its largest, with (Cdn.) $3.5 billion in gross sales for the fiscal year ended March 31, 2004. Molson products include a portfolio of beers including Molson Canadian, Molson Export, Molson Dry, Rickard's, A Marca Bavaria, Kaiser and Bavaria. Prior to the Merger, Molson was also a licensed authorized brewer and distributor of Coors brands in Canada under agreements between Molson and Coors. One of Molson's most profitable products was the Coors Light brand, which it manufactured and marketed throughout Canada.

42.    **Background: The Pre-Merger Companies – The Adolph Coors Company.** Prior to the Merger, Coors was the third-largest brewer in the United States and the second-largest brewer in the United Kingdom. Founded in 1873, Coors manufactured and marketed a portfolio of beer brands designed to reach several tastes, styles and price points. At fiscal year-end December 28, 2003, Coors had US $5.4 billion in sales. In the United States, Coors owns and/or licenses such brands as: Coors Light, Coors Original, Coors Edge, Coors Non-Alcoholic,

12

Aspen Edge, Extra Gold, Zima, George Killian's Irish Red Lager, Keystone, Keystone Light, Keystone Ice, Blue Moon Belgian White Ale and Mexicali. Coors also sells the Molson family of brands in the United States through a joint venture. Outside of the United States, Coors sells Carling, Worthington, Caffrey's, Reef, Screamers, Stones and, through a United Kingdom joint venture, Grolsch.

43. **Business of Molson Prior to the Merger**. The same day the respective companies announced that they had entered into a definitive Merger Agreement, Molson revealed that it was operating well-below plan. Specifically, Molson published its results for 1Q:F05, the three months ended June 30, 2004, and informed investors of the following:

- Excluding certain one-time "rationalization costs," Molson's consolidated EBIT was down (14.5%).

- Excluding certain one-time "rationalization costs," Molson's net earnings decreased (19.4%).

- Excluding certain one-time "rationalization costs," Molson's net earnings per share decreased (19.4%) – to $0.54 per share, versus consensus EPS estimates of $0.70 per share.

- Total Molson beer volume was down (3.4%) and volume in Canada was down (2.8%).

- Management in Canada and Brazil was replaced as part of Molson's "Regaining Momentum" strategy, as outlined in Molson's annual report.

- Molson's long-term goal of 10% EBIT growth remained, however, "lower Q1 performance will make this challenging in the current fiscal year." (Brian Burden, CFO Molson). [Emphasis added].

44. Later, in the period prior to the Merger, Molson disclosed that it did not, and would not in the foreseeable future, achieve 10% growth in earnings before interest and taxes ("EBIT"). On September 30, 2004, Molson published a release that warned investors that it was experiencing below-plan sales in Canada and weakening profits in Brazil. This release stated, in part, the following:

13

Molson Forecasts Lower Than Expected Second Quarter Earnings

Molson Inc. announced today that, on the basis of preliminary results compiled for the second quarter ending September 30, 2004, *earnings before non-recurring items, such as the charges related to the proposed merger with Coors, will be below the current range of estimates published by financial analysts.* Molson is making an early announcement as part of its reporting obligation to inform shareholders of this earnings shortfall.

*This unfavorable variance was driven by lower profitability in Brazil and lower volumes in Canada.* In Brazil, estimated volume was approximately 10% lower than a year ago and compounded by the high cost structure associated with the sales centers put in place over the last nine months. In Canada, a much cooler summer season in most regions across the country and the continued strength of the value segment in certain regional markets led to industry and market share declines.

*"From an EBIT standpoint, we expect results in Brazil to be slightly below Q1 levels, while the volume shortfall in Canada points to a mid single-digit percentage decrease in domestic EBIT",* indicated Brian Burden, Chief Financial Officer of Molson Inc.

*In light of the continuing challenge presented by the Brazilian beer market, Molson is performing an impairment test of assets in the region.* Though the impairment test is not completed, preliminary findings could justify a write-down of approximately CA$200 million. In addition, Molson is re-evaluating the business model in an effort to drive sustainable profitability in Brazil and specific cost reduction initiatives are being implemented.

*Last July, Molson indicated that the lower first quarter performance would make the attainment of the annual 10% EBIT growth target a challenge. Current quarter performance has confirmed that this will not be achieved in Fiscal 2005.* Molson will provide more detail when it issues second quarter results which have been rescheduled for Thursday, October 28th, 2004.

45.    Additional facts about Molson's financial and operational condition were known

to investors and analysts prior to the consummation of the Merger.  That same day, September

30, 2004, *Canada Press Newswire* reported, in part, the following:

Molson issues earnings warning: slow sales in Canada, weak profit in Brazil

14

MONTREAL (CP) - Molson Inc. has served up a warning of disappointing summer-quarter earnings, saying sales have been slow in Canada and profitability continues to be squeezed in Brazil.

The brewer also disclosed Thursday evening that it is considering a $200-million write-down on its Brazilian assets.

The operations in Brazil are currently valued on the company's books at about $700 million. Molson paid more than $1 billion in 2002 to acquire Kaiser, the second-largest brewer in the South American country, but the Brazilian adventure has become a quagmire: Kaiser's market share was estimated at 10.7 per cent in August, down from 13.1 per cent a year earlier.

In addition to the "preliminary" finding that a $200-million write-down might be warranted, Molson said it is "re-evaluating the business model in an effort to drive sustainable profitability in Brazil, and specific cost-reduction initiatives are being implemented."

Molson said July-September earnings in Canada are significantly below the previous quarter, and it confirmed that it will not meet its target of a 10 per cent increase in annual operating profit.

\* \* \*

*A Coors spokeswoman, Laura Sankey, said Thursday's news does not affect the U.S. brewery's position on the combination.*

*"We continue to believe that the merger of Coors and Molson is a great transaction that will create a stronger global competitor," Sankey said, adding that* <u>*Coors was not surprised by Molson's tepid results.*</u>

\* \* \*

For analysts surveyed by Thomson One Analytics, *this is the second consecutive unpleasant quarterly surprise from Molson. Their consensus estimate was for July-September earnings of 70 cents per share, the same as they had predicted for the previous quarter, when Molson came in at 53 cents.*

In that quarterly report issued July 22 - the same day the Coors merger plan was announced - Molson said earnings excluding restructuring charges and other one-time items fell 19 per cent from a year earlier to $68.3 million, as beer volumes were down 2.8 per cent in Canada and 4.2 per cent in Brazil. [Emphasis added.]

15

46.    **Business of Coors Prior to the Merger.**  During the pre-Merger period, Coors portrayed itself as a company that was experiencing above-consensus growth and profitability and was outperforming the market.  Just as Molson had published an earnings release the day the Coors-Molson Merger was announced, the same day, Coors too issued a release announcing its results for 2Q:04, the thirteen-week period ended June 27, 2004, only unlike Molson; Coors reported positive results:

- Consolidated net sales of $1.15 billion at Coors increased 4.6% over net sales reported by Coors in 2Q:03.

- Operating Income for Coors 2Q:04 increased 6.9% to $125.6 million, over operating income reported by Coors in 2Q:03.

- "Overall, second quarter results for Coors Brewing Company showed improved trends in several key areas of the business." (Leo Kiley, President and CEO).

- To the extent some sectors of business were negatively impacted, such adverse events were caused by "*largely temporary, factors*" and "*unique local issues.*" [Emphasis added.]

47.    Similarly, in the period prior to the Merger, Coors stated that the company was operating at or above plan, and *that the proposed Merger would provide Molson shareholders with significantly added strength and near-term profitability*.  For example, when defendants published a release on October 28, 2004, which announced financial results for the fiscal third quarter of 2004, incorporated by reference into the Proxy/Prospectus, defendants stated, in part, the following:

> HEADLINE: Coors Reports 2004 Third Quarter Results
>
> GOLDEN, Colo., Oct. 28 /PRNewswire-FirstCall/ -- Adolph Coors Company (NYSE:RKY) today announced higher consolidated net sales and net income on lower consolidated sales volume for the third quarter of 2004.
>
> For the 13-week quarter ended September 26, 2004, the company achieved consolidated net sales of $1.10 billion, *a 5.3 percent increase from third quarter 2003*. Third quarter 2004 sales volume totaled 8,559,000 U.S. barrels, or 10,043,650 hectoliters (HLs), a

16

2.4 percent decrease from 2003. Third quarter operating income was $103.9 million, down 5.0 percent from the same period a year ago. Consolidated third quarter 2004 net income was $64.1 million, *up 4.4 percent from third quarter 2003, and earnings per share were $1.68, equal to the third quarter last year.*

Leo Kiely, Coors Brewing Company (CBC) president and chief executive officer, said, "Overall, the third quarter was a tough volume quarter for Coors Brewing Company, with weak trends in both our Americas and Europe segments. Nonetheless, *our net income was higher due to improved beer pricing, one-time non-operating income, a lower effective tax rate and favorable exchange rates compared to the third quarter of last year.*

\* \* \*

"For the balance of 2004, we are focused on achieving a strong finish to the year. In the U.S., we will be lapping significant volume declines and additional costs related to our supply-chain disruptions in the fourth quarter of last year. Our new systems are now running smoothly and have resulted in substantially improved service to our distributors. In the U.K., in addition to our expectations that positive on-trade pricing will continue, we believe volume trends will improve from a difficult summer. On the other hand, if foreign exchange rates remain at today's levels, we anticipate less currency benefit to our U.K. financial results in the fourth quarter.

"We also continue to work toward closing our merger of equals with Molson. The transaction has received U.S. and Canadian anti-trust clearance, and we have filed a preliminary proxy statement for SEC review. *This transaction will build on the strengths of both companies, make us more competitive in the consolidating global beer market and increase profits, cash flow and shareholder value substantially in both the short and long term."* [Emphasis added.]

48.    **Merger Announcement / Synergies.**  As set forth above, Molson investors who voted for the Merger did so in reliance on Coors' representations that it was operating according to plan and, therefore, would provide the combined Company with a strong financial base and greater earnings per share.  This is evidenced by, among other things, the release that defendants published on July 22, 2004, announcing that the boards of directors of both Coors and Molson had entered into a definitive Merger Agreement:

17

- The combination of Coors and Molson is expected to "deliver substantial value to shareholders".

- The combination expected to deliver US$175 million in pre-identified synergies and cost savings, annually, by 2007 - - half of which would be achieved within 18 months of the completion of the Merger.

- The *transaction was expected to be accretive to earnings* to the shareholders of both companies within the first year of combined operations.

- The *"Th[e] transaction allows us to create a stronger company* in a consolidating global industry..." (Eric Molson, Chairman Molson Inc.).

- That "Together, Molson and Coors will become the world's fifth largest brewer, with the market and financial strength necessary to drive organic growth and compete more effectively in today's increasingly challenging global market." (Leo Kiely, CEO Coors)  [Emphasis added.]

49.    Defendants also represented that the combined Company would realize at least

$175 million in cost savings and synergies annually, in part, because defendants had created a

special "Office of Synergies," chaired by Daniel J. O'Neill, the former Chief Executive Officer

of Molson:

Synergies and Cost Savings

The companies intend to establish an Office of Synergies and Integration to facilitate the development and implementation of plans to achieve the expected benefits of the transaction. The Office will be responsible for the realization of cost savings and other synergies, including the alignment of related capital expenditures, by applying best practices and global benchmarking. The Office will be chaired by Daniel J. O'Neill and will also include Eric Molson and Leo Kiely.

*"In my new role, my responsibility will be to deliver the identified synergies, unlock additional opportunities and lead the teams that have the most past experience in making this happen.* The merger represents a transaction that will be difficult to match given the large value of synergies and the ability to reinvest additional synergies above the US$175 million to drive top-line sales growth," said Daniel J. O'Neill, president and chief executive officer of Molson Inc. "In addition, a merger with Coors allows our Canadian unit to secure the rights to sell and distribute the Coors Light brand, which might not be the case in an alternative transaction."

18

The combined company expects to achieve annualized synergies of approximately US$175 million by 2007. The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design, consolidated administrative functions and greater tax efficiencies. The companies expect to identify additional synergy opportunities between now and closing. These synergies are in addition to cost saving initiatives already underway at both companies. [Emphasis added.]

50.     **Merger Agreement.**  In connection with the Merger defendants prepared, ratified and filed with the SEC a Combination Agreement by and Among Aldoph Coors Company, Coors Canada, Inc. and Molson Inc., dated July 21, 2004 (the "Merger Agreement"). The Merger Agreement contained the following representations, warranties and conditions:

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF COORS

**4.9  Absence of Certain Changes or Events.**  *Since December 28, 2003, the business of Coors and its Subsidiaries has been conducted in the ordinary course consistent with past practices and there has not been (i) any event, occurrence or development of a state of circumstances or facts which has had or would, individually or in the aggregate, reasonably be expected to have any Material Adverse Effect on Coors,* (ii) any material revaluation by Coors of any of its assets, including, without limitation, writing down the value of capitalized inventory or writing off notes or accounts receivable or any material sale of assets of Coors other than in the ordinary course of business, (iii) any material damage, destruction or loss (whether or not covered by insurance) with respect to any material assets of Coors or its Subsidiaries, (iv) any material Contract cancelled, terminated, or materially adversely modified or (v) any event or action that if taken after the date hereof would be prohibited by Section 5.2 hereof.

                              *  *  *

### ARTICLE VII
### CONDITIONS

**7.2  Additional Conditions to Obligations of Molson.**  The obligation of Molson to consummate and effect the Arrangement shall be subject to the satisfaction at or prior to the Effective Time of each of the following conditions, any of which may be waived, in writing, exclusively by Molson:

19

(a) **Representations and Warranties.** *The representations and warranties of each of Coors and Exchangeco contained in this Agreement (without giving effect to any materiality (including the word "material") or "Material Adverse Effect" qualification) shall be true and correct as of the Closing Date* with the same effect as if made at and as of the Closing Date (other than such representations that are made as of a specified date, which shall be true and correct as of such date), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Coors or Exchangeco, as applicable. Molson shall have received a certificate with respect to the foregoing signed on behalf of Coors and Exchangeco by an authorized officer of Coors and Exchangeco.

(b) **Agreements and Covenants.** *Coors shall have performed or complied in all material respects with all agreements and covenants required by this Agreement* to be performed or complied with by it on or prior to the Closing Date, and Molson shall have received a certificate to such effect signed on behalf of Coors by an authorized officer of Coors.

(c) **No Material Adverse Change.** Since the date hereof, *there shall not have occurred any fact, event, change, development, circumstance or effect which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect on Coors.* [Emphasis added].

51.    It is clear from the foregoing that the Merger Agreement required defendants to report any material adverse change in Coors's business, operations and/or financial performance in the pre-Merger period. In addition, the Merger Agreement provided that if a rival bid for Molson were successful, Coors would end its licensing agreement with Molson in Canada, which would be detrimental to the combined entity.

52.    **Proxy Statement Dated: 12/10/04.** On or about December 10, 2004, defendants filed a proxy statement with the SEC, pursuant to Schedule 14A, which reaffirmed these disclosure requirements, in part, as follows:

> *Each party's obligation to complete the merger transaction is subject to the satisfaction of the following additional conditions by the other party:*
>
> • the material truth of representations and warranties and material compliance with covenants by the other party;

20

- the absence of events or changes that have or would reasonably be expected to have a material adverse effect on the other party;

\* \* \*

## Representations and Warranties

The combination agreement contains a number of customary representations and warranties of Molson and Coors relating to, among other things:

\* \* \*

- the accuracy of reports required to be filed with Canadian securities regulatory authorities and the Toronto Stock Exchange, in the case of Molson, and with the SEC and the New York Stock Exchange, in the case of Coors, since January 1, 2002 and the accuracy of the financial statements included in those reports;

- absence of undisclosed liabilities;

- absence of any material adverse effect and certain other changes or events since the date of the last audited financial statements;

53.    **Factors Considered by the Molson Independent Committee.**  The December 2004 Proxy Statement also reported on the specific factors considered and purportedly relied upon by Molson's Independent Committee, prior to ratifying the Merger Agreement and prior to advising Moldon shareholders to vote in favor of the Merger:

> ### Factors Considered by the Molson Independent Committee
>
> On July 21, 2004, Molson's independent committee, after an extensive review and thorough discussion of all facts and issues it considered relevant with respect to the proposed merger transaction, concluded unanimously that the proposed merger transaction is fair to, and in the best interests of, the shareholders of Molson, other than Pentland and Eric H. Molson, from a financial and non-financial point of view. The Molson independent committee subsequently proposed that Molson's full board of directors authorize Molson to enter into the proposed combination agreement and recommend to shareholders of Molson that they vote in favor of the Molson shareholders resolution. On November 10, 2004, the Molson independent committee reaffirmed the conclusions reached on July 21, 2004 as well as the recommendations to Molson's full board of directors regarding the proposed combination agreement, as amended, and the Molson shareholders special resolution.

21

In reaching their conclusion and making their recommendation, the members of the Molson independent committee relied on their personal knowledge of Molson and the industry in which it is involved and on the advice of its legal and financial advisors. The Molson independent committee also reviewed the information provided by Molson and its advisors. *The Molson independent committee considered numerous factors to be in favor of the merger, including among other things, the following:*

* * *

- *the current economic, industry and market trends affecting each of Molson and Coors in their respective markets*, including those which favor the concentration of business in the hands of a small number of large companies;

* * *

- *the significant opportunities for the combined company to realize the estimated annual cost savings resulting from the merger* of approximately U.S.$50 million and $90 million, respectively, in the first two years following the merger and U.S.$175 million in annual cost savings thereafter;

- the ability of the shareholders of Molson to continue to participate in future earnings and growth of the combined company after completion of the merger transaction through their ownership of shares of the combined company's stock or exchangeable shares of Molson Coors Exchangeco; [Emphasis added].

54.    **Preliminary Proxy-Prospectus.** On or about September 17, 2004, when defendants first filed the Preliminary Proxy Statement with the SEC, Coors issued a release which highlighted the purported benefits of the Merger, Molson's reasons for the Merger, and again quoted defendants, in part, as follows:

> *The combination is expected to unlock significant value for shareholders.* From the outset, value creation will come from both the ability to focus marketing investments on core brands to grow revenues and the ability to capture an expected US$175 million in annualized synergies, half of which are expected to be realized within the first 18 months following completion of the merger. Secondly, *a stronger overall financial platform will lead to deeper support of core brands and key markets to drive revenue, share and volume growth. Finally, the merger will create the scale and balance sheet strength to allow Molson Coors Brewing Company*

22

*to compete more effectively in the increasingly global and highly dynamic brewing industry long-term.*

Leo Kiely, chief executive officer of Coors, stated, "Today's filing of the preliminary proxy is an important step in the merger process. *We look forward to continuing to demonstrate to our shareholders the compelling nature of this transaction, notably its ability to create shareholder value on a sustained basis. I'm confident in our ability to achieve our goals for the new organization,* and I am excited to work with a strong management team that represents a balanced combination of talent from both organizations."

Daniel J. O'Neill, chief executive officer of Molson, stated, "Through the capture of US$175 million in synergies, all of which will be taken to the bottom line in the first three years, this transaction will result in a 24 percent increase in pro forma profitability above current base-line trends. Given the combined company's significant cash flow and strong balance sheet with relatively low debt levels, we will also have the financial resources to make the investments necessary to ensure the ongoing strength of our brands." [Emphasis added].

55.    **Final Prospectus : The Merger Transaction**. The foregoing statements were also reproduced and/or incorporated by reference into the Company's Proxy/Prospectus, which described the final terms of the Merger, in part, as follows:

**The Merger Transaction**

The merger transaction featured the following steps:

- Adolph Coors Company changed its name to "Molson Coors Brewing Company" and amended its certificate of incorporation and bylaws to implement the merger transaction.

- Molson paid a special dividend in the amount of Cdn.$5.44 per share, or a total of approximately Cdn.$652 million (U.S.$519 million, based on exchange rates as of February 7, 2005) in connection with the plan of arrangement to Molson Class A non-voting and Class B common shareholders of record at the close of business on the last trading day immediately prior to the date of closing the merger transaction, excluding Pentland Securities (1981) Inc. and its subsidiaries (referred to collectively in this prospectus as "Pentland"). In the interest of demonstrating its support for the merger transaction, Pentland waived any participation in the special dividend.

- All of Molson's shares (other than shares of dissenting holders) were exchanged, through a series of exchanges, for shares of Molson Coors common stock and/or exchangeable shares of Molson Coors Exchangeco.

- The stockholders of Coors retained their shares, which remained outstanding as shares of Molson Coors.

The combination was carried out in accordance with a combination agreement, dated as of July 21, 2004, as amended, by and among Molson, Coors and Molson Coors Exchangeco, and the documents referred to in that agreement. Upon completion of the merger transaction:

- Each holder of Molson Class A non-voting shares who was a Canadian resident for Canadian income tax purposes received, for each of those shares, either (i) 0.360 of a Class B exchangeable share of Molson Coors Exchangeco (and certain ancillary rights), (ii) through a series of exchanges, 0.360 of a share of Class B common stock of Molson Coors, or (iii) an equivalent combination of Class B exchangeable shares (and certain ancillary rights) and, through a series of exchanges, Class B common stock of Molson Coors.

- Each holder of Molson Class A non-voting shares who was not a Canadian resident received, through a series of exchanges, for each of those shares, 0.360 of a share of Class B common stock of Molson Coors.

- Each holder of Molson Class B common shares who was a Canadian resident for Canadian income tax purposes received, for each of those shares, either (i) 0.126 of a Class A exchangeable share and 0.234 of a Class B exchangeable share of Molson Coors Exchangeco (and certain ancillary rights), (ii) through a series of exchanges, 0.126 of a share of Class A common stock and 0.234 of a share of Class B common stock of Molson Coors, or (iii) an equivalent combination of exchangeable shares (and ancillary rights) and, through a series of exchanges, shares of Molson Coors common stock.

- Each holder of Molson Class B common shares who was not a Canadian resident received, through a series of exchanges, for each share, 0.126 of a share of Class A common stock and 0.234 of a share of Class B common stock of Molson Coors.

56.    **Documents Incorporated by Reference.**  The Proxy/Prospectus incorporated by

reference additional SEC filings as set forth below:

The SEC allows us to "incorporate by reference" the information we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of

24

this prospectus. If information contained directly in this prospectus is inconsistent with information contained in a document filed with the SEC prior to the date of this prospectus, the information contained directly in this prospectus will apply and will supersede such previously filed information. Information that we later file with the SEC will automatically update and supersede the information contained directly or incorporated by reference in this prospectus. Accordingly, we incorporate by reference the documents listed below and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 prior to the termination of this offering:

| **Coors Filing** | **Periods:** |
|---|---|
| Annual Report on Form 10-K | Year ended December 28, 2003. |
| Quarterly Reports on Form 10-Q | Quarters ended March 28, 2004, June 27, 2004 and September 26, 2004. |
| Current Reports on Form 8-K | Filed February 5, 2004, April 9, 2004, April 22, 2004, May 21, 2004, June 9, 2004, July 20, 2004, July 22, 2004 (two filings), August 3, 2004 (two filings), August 4, 2004, August 10, 2004, October 1, 2004, October 28, 2004, November 5, 2004, November 15, 2004, November 17, 2004, January 7, 2005, January 14, 2005, February 7, 2005 and February 9, 2005. |

We also incorporate by reference (i) the Joint Proxy Statement/Management Information Circular that we filed with the SEC on Schedule 14A on December 10, 2004, including the consolidated balance sheet of Molson Inc. as at March 31, 2004 and March 31, 2003 and the consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the years then ended and March 31, 2002, the unaudited consolidated balance sheet of Molson Inc. as at September 30, 2004, the unaudited consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the six months ended September 30, 2004, and (ii) the Supplement to Joint Proxy Statement/Management Information Circular that we filed with the SEC on Schedule 14A on January 19, 2005, including the Unaudited Pro Forma Condensed Combined Balance Sheet of Molson Coors Brewing Company as of September 26, 2004 and

the Unaudited Pro Forma Condensed Combined Income
Statements of Molson Coors.

57.    **Molson Shareholders Approve the Merger**.  Based on defendants materially

false and misleading representations about the nature and effect of the Merger and the financial

condition performance of Coors, in late-January 2005, shareholders of Molson cast their proxies

and voted overwhelmingly in favor of the Merger.  Thereafter, on February 9, 2005, the Merger

was consummated and, immediately thereafter, the combined Company issued a release which

stated, in part, the following:

Molson and Coors Complete Merger to Form Molson Coors Brewing Company

> MONTREAL, Canada and GOLDEN, Colorado, Feb. 9 / - Molson
> Inc. (TSX: MOL.A) and Adolph Coors Company (NYSE: RKY)
> today announced that they have completed the transaction
> announced on July 22, 2004 to combine Molson and Coors in a
> merger of equals. Molson Coors Brewing Company is a new
> global brewing company with the operating scale and balance
> sheet strength to be a major player in the continuing consolidation
> of the brewing industry.
>
> Molson and Coors shareholders approved the combination at their
> special shareholder meetings held on January 28 and February 1,
> 2005, respectively, and the Quebec Superior Court approved the
> transaction as required by Canadian law on February 2, 2005.
>
> *W. Leo Kiely III, chief executive officer of Molson Coors
> Brewing Company said, "By combining Molson and Coors, we
> have created a company with the market and financial strength
> necessary to drive organic growth and compete more effectively
> in today's increasingly challenging global market,* while
> preserving the rich heritages of two of the world's most prominent
> brewing companies. We look forward to drawing on this brewing
> heritage and the combined strengths of a world-class management
> team to deliver greater value to our customers, partners, employees
> and shareholders."
>
> "This transaction marks a new and important chapter in the history
> of both companies," said Eric H. Molson, chairman of Molson
> Coors Brewing Company. *"It leverages successful business
> relationships and builds on the strategic and cultural fit between
> our two companies. With an impressive track record in brewing
> excellence, the new Molson Coors Brewing Company will be a
> dynamic and competitive organization that will create long-term*

26

*value for our shareholders and the communities in which we operate."*

\* \* \*

**Synergies and Cost Savings**

*The company has established an Office of Synergies and Integration to facilitate the development and implementation of plans to achieve the expected benefits of the transaction. Through this Office, chaired by Daniel J. O'Neill, the company expects to achieve annualized synergies of approximately US$175 million over three years.* The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design and consolidated administrative functions. [Emphasis added.]

58.    **Molson Results for 3Q:F04.**  The same day, February 9, 2005, defendants issued a release that announced financial and operational results for Molson in its last quarter as a non-combined company.  These results, announcing "virtually flat" net sales revenues, came as no surprise to investors.  Accordingly, that day, while shares of the Company traded down slightly on the first day of trading, to $73.50 from about $75.75, this 3% price decline was expected. The Company's CFO, defendant Wolf, was quoted by the *Associated Press* as stating that Molson's results were "overall, as anticipated."

59.    **Coors Results for 4Q and FY:2004.**  On February 9, 2005, defendants also issued a release that purported to announce financial and operational results for Coors 4Q and fiscal year 2004 as a non-combined company.  Coors's release, which purported to announce higher consolidated net sales, net income and earnings per share for 4Q and FY:2004 stated, in part, the following:

**Molson Coors Reports Adolph Coors Company 2004 Fourth Quarter and Full-Year Results**

GOLDEN, Colo., Feb. 9 -- Molson Coors Brewing Company (NYSE, TSX: TAP) today announced the most recent financial results for Adolph Coors Company, *reporting higher consolidated*

27

*net sales, net income and earnings per share for the fourth quarter and full-year 2004.*

For the 13-week fourth quarter ended Dec. 26, 2004, the company reported net sales of $1.1 billion, *up 10.2 percent from the fourth quarter of 2003. Fourth quarter 2004 sales volume increased 4.7 percent from the fourth quarter 2003. Fourth quarter operating income of $90.9 million and net income of $55.7 million increased 37.5 percent and 54.4 percent, respectively, from a year ago. Fourth quarter earnings per share were $1.45, up 48.0 percent from a year earlier.* Earnings for fourth quarter 2004 benefited from solid beer pricing and volume growth in the company's Americas and Europe segments, along with one-time gains on asset sales totaling $19.2 million pretax, a lower effective tax rate, and favorable foreign currency exchange rates. These results do not include Molson Inc. financial results for the quarter ended December 2004, which were released separately.

*For the 52-week fiscal year ended Dec. 26, 2004, Adolph Coors Company achieved consolidated net sales of $4.3 billion, a 7.6 percent increase from 2003.* Reported sales volume totaled 32,703,000 U.S. barrels, or 38,376,000 hectoliters, in 2004, a 0.1 percent decrease from 2003. *Net income for the full year was $196.7 million, a 12.6 percent increase compared to full year 2003, and earnings per share were $5.19, up 8.8 percent from the prior year.*

Leo Kiely, chief executive officer, said, *"Overall, Adolph Coors Company finished 2004 with good financial results in a very competitive industry environment.* In the U.S., despite very soft industry demand, our sales to retail increased in the fourth quarter, partially driven by the comparison to lower sales in the fourth quarter of 2003, when we faced U.S. supply-chain challenges. Our volume trends also benefited from the introduction of Aspen Edge earlier this year and strong growth from our Blue Moon and Zima XXX brands in the fourth quarter. In addition, *continued progress on productivity initiatives in our U.S. operations enabled us to manage cost pressures,* which were particularly challenging in the areas of energy and packaging materials. *In Canada, our Coors Light business continued to deliver strong profit growth.*

\* \* \*

"Looking ahead, we will be simultaneously focused on improving the fundamentals of our U.S. and U.K. businesses and on working with our new colleagues from Molson to maximize the value opportunities presented by the Molson Coors merger, which closed earlier today." [Emphasis added.]

60.    Defendants' representations, particularized above, were materially false and misleading when made because they failed to disclose the following facts:

a.    When the Merger closed on or about February 9, 2005 - - almost a third of the way into the first fiscal quarter of 2005 - - it was not true that Coors was operating according to plan, nor was it true that no material adverse change in Coors's business had occurred;

b.    Defendants violated the terms of the Merger Agreement and the Proxy\Prospectus by failing to disclose that, by that time, Coors's business was being, and would continue to be, adversely impacted by conditions which were then already causing Coors to perform well below plan, and well below consensus estimates;

c.    At the time of the Merger, it was foreseeable that O'Neill would not participate in any meaningful way in the integration of the two companies, and would not fulfill the duties and responsibilities of the Office of Synergies and Integration; and

d.    At the time of the Merger, defendants were motivated to conceal the adverse conditions which were then impacting Coors and did conceal these adverse conditions because it allowed defendants to arrange the Merger transaction such that the relatives and heirs of the Coors and Molson families could dominate the combined Company - - by collectively being able to nominate at least 10 members of the 15 member Board.

## THE TRUTH BEGINS TO BE REVEALED

61.    It was only weeks after the close of the Merger that investors learned that Coors was operating well below plan. On April 28, 2005, before the open of trading, defendants published a release announcing disappointing results for the Company's first quarter of 2005. In the release, defendants revealed, in part, the following:

Molson Coors Reports 2005 First Quarter Results

29

DENVER, April 28 /PRNewswire-FirstCall/ -- Molson Coors Brewing Company (NYSE: TAP; Toronto) today announced higher consolidated net sales and sales volume for the first quarter of 2005 compared to the first quarter of 2004, but *reported a net loss in the 2005 first quarter. The net loss was primarily attributable to lower sales volume in key markets versus a year earlier and special charges related to the recent Molson Coors merger totaling $40.7 million in the first quarter of 2005.*

The company's 2005 first quarter results include the business of Molson Inc. following the completion of the merger on Feb. 9, 2005, compared to the first quarter of 2004, which includes only the results of the former Adolph Coors Company. The company's reported consolidated sales volume and net sales increased in the 2005 first quarter compared to the first quarter 2004 due to the combination of the Molson and Coors businesses.

For the 13-week first quarter ended March 27, 2005, the merged company reported net sales of $1.1 billion and sales volume of 8,094,000 barrels, or 9,497,985 hectoliters (HLs). The company reported a net loss of $46.5 million, or $0.74 per share, during the 2005 first quarter. *Excluding special items, the company reported an after-tax loss of $5.1 million during the 2005 first quarter.* (See the company's website, www.molsoncoors.com for reconciliation to the nearest U.S. GAAP measure.)

* * *

On a pro forma basis, the company reported a consolidated net loss of $79 million, or $0.91 per share, based on 86.2 million pro forma diluted shares outstanding during the 2005 first quarter.

Leo Kiely, Molson Coors president and chief executive officer, said, *"The common underlying cause for difficult first quarter results was the lack of volume growth in each of our major markets.* While disappointing, this performance reinforces the importance of integrating the operations and organization of the combined company, so we can capitalize on our new strengths and build an even more competitive and profitable global enterprise. [Emphasis added.]

62.    Immediately following publication of this release, shares of the Company fell

precipitously, almost $14.50 per share, to $63.00 per share, a decline of almost 20% - - a

testament to investors surprise and disappointment in the results. The *Denver Post*, reported, in

part, the following:

30

Molson Coors shares fell $14.30 to $63. The 19 percent decline was the fifth-largest loss Thursday among companies listed on the New York Stock Exchange.

*The quarterly loss of 74 cents a share was unexpected by Wall Street analysts, who in consensus forecasts had predicted a 36-cent-a-share profit.*

*"These results are well below our performance goals and the potential we see for the company,"* chief executive Leo Kiely said in a conference call. "We obviously had a very tough first quarter in each of our markets."

*Beer sales fell 2 percent in Canada and the United States and 17 percent in the United Kingdom, Molson Coors said.* [Emphasis added.]

63.     Following publication of these shockingly disappointing results, defendants hosted a conference call, a transcript of which was available publicly from various sources, for analysts and investors during which defendants also revealed, in part, the following:

- *Pro forma volume of only 10.7 billion barrels represented a 5.6% decline yr/yr due to lower volumes in all of the Company's major markets*;

- *Net sales were also down 6% pro-forma yr/yr to $1.2 billion*;

- *Pro-forma net loss was $79.0 million* versus a pro-forma net gain of $36 million reported in 1Q:04 - - *excluding charges, pro-forma net loss was $4.0 million or $0.04 per share*

- *Excluding Molson brands, pro forma US volume year over year declined 3.6% due to soft sales to retail* and because distributors ended the first quarter last year with inventories about 100,000 barrels higher than normal due to rollout of Aspen Edge and re-launch of Zima;

- *"These results are well below our performance goals and the potential we see for our Company."* (Defendant Kiely). [Emphasis added].

64.     **O'Neill Resigns, Pockets $4.8MM Severance Payment.** The same day, April 28, 2005, O'Neill announced that he would abandon the Chair of Office of Synergies and Integration, leave the Company and take with him millions of dollars in severance related payments - - which payments were not change of control payments and which payments he could

31

not have obtained had he not waited for the Merger to close.  According to the *Rocky Mountain News* (Denver, CO), O'Neill would receive, in part, the following:

> **HEADLINE: BREWERY EXEC'S EXIT LUCRATIVE; MOLSON COORS VICE CHAIRMAN GETS $4.8 MILLION SEVERANCE**
>
> Molson Coors Vice Chairman Dan O'Neill will resign *with a multimillion-dollar severance package,* joining the ranks of departing executives who exit the brewer with buckets of cash.
>
> *O'Neill will get about $66,709 per month for the next three years - a total of $2.4 million - plus a special bonus of $2.4 million for delivering the "synergies and integration plan" to the Molson Coors board at next month's meeting.*
>
> *In addition, all the restrictions on his stock options lapse.* Most of his options, given to him when he was CEO of Molson, required the stock to gain significantly before the options could be used. The company now has waived those rules.
>
> *O'Neill cashed out the remainder of a 1999 Molson options grant earlier this year, giving him roughly $33 million in pretax profits.*
>
> He is not the only executive to have benefited from the merger. *Previously, 12 former Adolph Coors Co. executives used change-of-control provisions in their employment contracts to resign and collect two years' worth of salary and bonus. The payments cost Molson Coors $29 million this quarter,* the company said Thursday.
>
> \* \* \*
>
> The specifics of *the announcement came as a surprise to some, however. Coors and Molson heavily sold their merger on $175 million in annual synergies and told investors that O'Neill would be in charge of the cost-cutting plan.*
>
> But the company had to back off a special $3 million payment O'Neill was to get after the merger closed. Instead, the companies said O'Neill would get the payment only if he left the company.
>
> *The new $4.8 million deal, disclosed Thursday, is even more lucrative than the one that irked shareholders last summer.*
>
> *"It's ludicrous,"* said Michael Palmer of Toronto's Veritas Research, a longtime harsh critic of Molson. "The company lost 5 market-share points (in Canada). . . . I always like to think in a capitalist system, people are rewarded for success, not for (messing up)."[Emphasis added.]

32

65.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, defendants made or caused to be made a series of materially false or misleading statements, and omitted to disclose material adverse facts about the Coors and/or the Company, its business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Coors and/or the Company and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions contained in the Merger Agreement and joint Merger Proxy/Prospectus resulted in plaintiff and other members of the Class exchanging their shares for shares of the Company at artificially inflated prices, thus causing the damages complained of herein.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

66. ·    At all relevant times, the markets for Coors, and the Company's securities were efficient markets for the following reasons, among others:

a.    The stock of Coors and the Company shares met the requirements for listing on major national and international securities markets, and were listed and actively traded in the United States, on the New York Stock Exchange, and in Canada, on the Toronto Stock Exchange, both of which were highly efficient and automated markets;

b.    As a regulated issuer, Coors and the Company filed periodic public reports with the SEC and each of the individual exchanges upon which their shares traded;

c.    Defendants and the respective companies regularly communicated with public investors *via* established market communication mechanisms, including through regular

33

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> d.      Coors and the Company were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67.      As a result of the foregoing, the market for Coors and the combined Company's securities promptly digested current information regarding the respective companies from all publicly available sources and reflected such information in Coors and the combined Company's share price. Under these circumstances, all former shareholders of Molson who surrendered their Molson shares in the February 2005 Merger, and all open market purchasers of Coors and the Company's securities during the Class Period, suffered similar injuries and a presumption of reliance applies.

## NO SAFE HARBOR

68.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company, who knew that those statements were false when made.

## COUNT I.

### (Against All Defendants)
### For Violation of Section 14(a)
### of the Exchange Act and SEC Rule 14a-9

69.     Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein only to the extent, however, that such allegations do *not* allege fraud, scienter or the intent of the defendants to defraud plaintiff or members of the Class. This count is predicated upon defendants strict liability for making false and materially misleading statements in the Registration Statement and/or Proxy-Prospectus. This Count is asserted by plaintiff against all defendants by and on behalf of persons who acquired shares of the Company pursuant to the false Registration Statement and Proxy Statement issued in connection with the February 2005 Merger.

70.     As a result of the foregoing, the defendants named herein violated §14(a) of the Exchange Act and obtained the approval of the Merger by the Molson shareholders by way of a false and misleading Prospectus.

71.     These defendants prepared, disseminated and/or approved the false Joint Proxy/ Prospectus specified above, which contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.    Defendants have violated §14(a) of the Exchange Act and SEC Rule 14a-9 in that they issued the Prospectus to solicit and obtain the votes of Molson shareholders, to approve the Merger of Molson by and into the Company by making statements which defendants should have known were untrue and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.    As a consequence of the foregoing course of conduct, and the resulting decline in the price of the Company's stock, plaintiff and the members of the Class have been damaged.

## COUNT II.

### (Violations Of § 10(b) Of The Exchange Act And Rule l0b-5 Promulgated Thereunder Against All Defendants)

74.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein, except the allegations in Count I.

75.    During the Class Period, Defendants engaged in a plan, scheme and course of business which operated as a fraud upon Plaintiffs and other Class Members, and made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and other Class Members as set forth above. The purpose and effect of this scheme was to induce Plaintiffs and the other members of the Class to purchase the Company's securities during the Class Period at artificially inflated prices.

76.    By reason of the foregoing, Defendants knowingly or recklessly violated § 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

36

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their purchases of the Company's common stock during the Class Period.

77.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above, Plaintiffs and other members of the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities. Plaintiffs and the other members of the Class would not have purchased Coors and/or Molson Coors securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements and omissions. At the time of the purchase of Coors and/or Molson Coors securities by Plaintiffs and the other members of the Class, the fair market value of said securities was substantially less than the prices paid. Plaintiffs and the other members of the Class have suffered substantial damages as a result.

78.    Each misrepresentation and/or omission of material fact alleged herein was made with reckless disregard for, or knowledge of its false and misleading nature.  At all relevant times, each defendant knew the material facts. Thus, the misrepresentations and omissions complained of herein were made with the Defendants' knowledge of their falsity, or, at the very least, with recklessness with respect to their truth or falsity.

79.    The Individual Defendants had the opportunity to commit and participate in the fraud described herein. The Individual Defendants were high ranking officers and/or directors of Coors and/or the Company and thus controlled the Company's press releases, corporate reports, SEC filings and communications with analysts.

80.    Defendants had the motive to commit and participate in the fraud.

81.    As set forth above, Defendants were on notice at all times during the Class Period about the true state of Coors's business. Thus, defendants knew or recklessly disregarded the negative facts alleged herein at all relevant times. Nevertheless, defendants acted to suppress and conceal the truth about from investors, and actively misrepresented the benefits of the merger.

## COUNT III.

### (Violations of § 20(a) Of The Exchange Act Against The Individual Defendants)

82.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein, except the allegations in Count I.

83.    The Individual Defendants acted as controlling persons of Coors and/or Molson Coors within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

38

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.    As set forth above, Coors and/or Molson Coors and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

b.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

e.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

By: _____

Seth D. Rigrodsky (DSBA No. 3147)
Ralph N. Sianni (DSBA No. 4151)
Brian D. Long (DSBA No. 4347)
919 North Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)

– and –

Steven G. Schulman
Peter E. Seidman
Andrei V. Rado
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300
(212) 868-1229

**MURRAY, FRANK & SAILER LLP**

Eric J. Belfi
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

*Attorneys for Plaintiff*

**LAW OFFICES OF MICHAEL A. SWICK**
One William Street, Suite 900
New York, NY 10004
Telephone: (212) 584-0770
Facsimile: (212) 584-0799

*Of Counsel*

## CERTIFICATION

I, Ingrid Ochodek, Plan Administrator for Drywall Acoustic Lathing and Insulation Local 675 Pension Fund ("DALI"):

1. I have reviewed the complaint and authorized its filing.

2. DALI purchased or otherwise acquired securities of Molson Coors Brewing Company, which are the subject of the complaint, *but not* at the direction of its counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. DALI is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to this certification, DALI has applied to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws in the following actions: *DALI v. Molex* (N.D. Ill. 2005).

5. During the Class Period, DALI engaged in the following transactions:

### TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|-------------|-----------|---------------|-----------------|

*See attached.*

6. DALI will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and its activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of its attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 05/13/2005.          Signature _____

                                              Ingrid Ochodek
                                              Plan Administrator for DALI

**Schedule A**
**DRYWALL ACOUSTIC LATHING AND INSULATION LOCAL 675**
**PENSION FUND**
**Molson Coors Brewing Company (NYSE and TSX: TAP)**

**Exchange:**

On 2/9/05, 125,700 Molson shares were exchanged for 45,252 Molson Coors shares in connection with the merger of Molson and Coors.