# Exhibit E

LEXSEE 1998 U.S. DIST. LEXIS 1199

IN RE LLOYD'S AMERICAN TRUST FUND LITIGATION

96 Civ. 1262 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1998 U.S. Dist. LEXIS 1199*

February 4, 1998, Decided
February 6, 1998, Filed

**DISPOSITION:** [*1] Plaintiffs' motion to certify class granted and plaintiffs' application to appoint Ms. Rose as class representative denied. Plaintiffs' motion to compel discovery granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiffs: DAVID J. BERSHAD, ESQ., SANFORD P. DUMAIN, ESQ., REGINA L. LaPOLLA, ESQ., Of Counsel, MILBERG WEISS BERSHAD HYNES & LERACH, New York, NY.

For Plaintiffs: KENNETH A. LAPATINE, ESQ., MARK BUDOFF, ESQ., Of Counsel, CAMHY KARLINSKY & STEIN, New York, NY.

For Citibank, N.A., Defendant: FREDERICK T. DAVIS, ESQ., DONALD A. GOLDSMITH, ESQ., HENRY WEISBURG, ESQ., Of Counsel, SHEARMAN & STERLING, New York, NY.

For Citibank, N.A., Defendant: JOHN H. HALL, ESQ., ROBERT N. SHWARTZ, ESQ., Of Counsel, DEBEVOISE & PLIMPTON, New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION:**
  OPINION

Sweet, D.J.

Plaintiffs in this action for breach of fiduciary duty have moved to certify the class pursuant to *Rule 23(b)(3), Fed. R. Civ. P.*, and to compel discovery pursuant to *Rule 37(a), Fed. R. Civ. P.* Plaintiffs seek to certify a class of approximately 1,700 current and former beneficiaries of trust funds held by the defendant, Citibank, N.A. ("Citibank"), [*2] in connection with insurance underwriting performed by plaintiffs through Lloyd's of London ("Lloyd's"). For the reasons set forth below, plaintiffs' motion to certify the class is granted, Mr. Rose and Mr. Stamm are appointed class representatives, and plaintiffs' application to appoint Ms. Rose as class representative is denied. Further, as set forth below, plaintiffs' motion to compel discovery is granted in part and denied in part.

**Prior Proceedings**

This litigation was commenced on December 29, 1995 with the filing of two identical actions in the Supreme Court, New York County. See Celauro v. Citibank, N.A. (with Gasper Celauro, Warren Peterson, Mark Rose and Elice Joy Rose as plaintiffs); Montana v. Citibank, N.A. These actions were then consolidated with a third identical action. See Norton v. Citibank, N.A.

On February 21, 1996, Citibank removed the consolidated actions to this Court, pursuant to *12 U.S.C. § 632*, and moved to dismiss on various grounds, including the argument that, for various reasons, this case should be litigated in England. Plaintiffs filed a motion to remand on April 6, 1996, which the Court denied in a written opinion dated [*3] June 7, 1996. See *In re Lloyd's Am. Trust Fund Litig., 928 F. Supp. 333 (S.D.N.Y. 1996).*

Case 1:05-cv-00317-GMS    Document 33-4    Filed 08/02/2005    Page 3 of 16

1998 U.S. Dist. LEXIS 1199, *                                                    Page 2

Philip Stamm ("Mr. Stamm") thereafter filed his complaint in this Court on August 6, 1996, and it was consolidated with the previously filed actions.

Citibank's motion to dismiss was heard on September 11, 1996, and the Court issued its decision on January 24, 1997, granting that motion in part and denying it in part. See *In re Lloyd's Am. Trust Fund Litig.*, 954 F. Supp. 656 (S.D.N.Y. 1997).

On July 31, 1996, plaintiffs filed a motion for a preliminary injunction seeking to restrain Citibank from soliciting releases from members of the proposed class in connection with a corporate reorganization and recapitalization plan. At oral argument plaintiffs essentially abandoned their application, although the court did permit plaintiffs to write to members of the proposed class to provide them with notice of how Lloyd's settlement offer and release affected their rights to participate in this action.

On March 5, 1997, plaintiffs served a consolidated amended complaint, which, in accordance with the Court's decision on the motion to dismiss, limited the action to a claim for breach of fiduciary [*4] duty and redefined the class to include all Names, worldwide, who underwrote American Business.

On April 2, 1997, pursuant to *28 U.S.C. § 1292*(b), Citibank moved to certify for appeal the Court's order denying in part Citibank's motion to dismiss. That motion was heard on June 18, 1997, and the Court's order granting that motion was entered on August 13, 1997. The Second Circuit declined to hear the interlocutory motion on October 10, 1997.

On June 25, 1997 and July 2, 1997, plaintiffs filed the instant motions for class certification and to compel Citibank to comply with certain discovery requests, respectively. Oral argument for both the certification and discovery motions was held on September 17, 1997, at which time the motions were deemed fully submitted.

**Facts**

The facts in this case have been set forth in prior opinions of the Court, familiarity with which is assumed. See *In re Lloyd's Am. Trust Fund Litig.*, 954 F. Supp. 656 (S.D.N.Y. 1997); *In re Lloyd's Am. Trust Fund Litig.*, 928 F. Supp. 333 (S.D.N.Y. 1996). Accordingly, we limit the facts presented below to those facts bearing directly on this motion.

**I. BACKGROUND ON LLOYD'S**

**A. [*5] Underwriting At Lloyd's**

Lloyd's of London is an insurance market comprised of (1) the Society and Corporation of Lloyd's ("Lloyd's"), which regulates the Lloyd's insurance market; (2) the Council of Lloyd's, Lloyd's governing body; (3) individual underwriting members ("Names"), who underwrite insurance through groups called syndicates; (4) managing agents, who manage syndicates; and (5) member's agents, who consult with Names they represent to select syndicates in which to participate.

Names generally participate in more than one syndicate in order to diversify their risk by spreading their underwriting activities across different types of insurance, different syndicate managers and different currencies. Names underwrite and accept a certain proportion of the risks of a particular syndicate in return for a share of the profits derived from the premiums paid for insurance written, and share in the same ratio of any losses resulting from insurance claims. Each Name is potentially liable beyond the full extent of his net worth to pay his proportionate share of any loss incurred under Lloyd's policies issued on which the Name participates. Each Name who is a member of the syndicate [*6] is responsible only for that part of the syndicate business which he has agreed to underwrite, and is not responsible for the liabilities of other members of the syndicate or any other Name.

To become a member of Lloyd's, a Name must sign a series of standard agreements which specify the rights, duties, responsibilities and liabilities of the Name, the member's agents, the managing agents and the Society of Lloyd's. The key agreement is the General Undertaking. Other relevant agreements include: (1) the member's agent's agreement, whereby a Name appoints a member's agent to assist in selecting syndicates and to keep the Name informed of all material developments that affect that Name's underwriting; (2) the managing agent's agreement, designating the managing agent responsible for underwriting for Names on that agent's syndicate; and (3) the Lloyd's Premiums Trust Deed, which provides for the establishment of the Lloyds American Trust Fund (the "LATF").

To qualify for membership in Lloyd's, a Name must demonstrate that he or she has sufficient assets to pass a "means test." A Name is further required to provide security with respect to his or her underwriting business at Lloyd's [*7] in the form of a "Lloyd's Deposit," which usually takes the form of an irrevocable letter of credit.

All active Names are also required to contribute annually to the Central Fund for each year of account in which the Name is an underwriter. The Central Fund is designed as a means for the Council to make good any default by any Name under any contract of insurance underwritten at Lloyd's. The transfer of funds from the Central Fund is directed in Lloyd's sole discretion.

**B. The Lloyd's American Trust Fund**

Pursuant to the U.K. Insurance Companies Act of 1982, all premiums relating to a Name's underwriting must be placed into a trust fund in accordance with the provisions of a trust deed approved by the U.K. Secretary of State for Trade and Industry. Accordingly, all premiums paid by policyholders are deposited in one of three types of Lloyd's trust funds, depending on the currency in which the premiums are paid.

One of the trust funds is the LATF, created by Lloyd's in 1939 through a deposit with Citibank's corporate predecessor. The principal of the LATF is held in trust to pay losses, claims and other expenses in connection with "American Business," which is defined as [*8] Lloyd's policies on which both premiums and claims are payable in United States dollars. The LATF is governed by the terms of the Lloyd's American Trust Deed (the "LATD").

The syndicates are "annual ventures" which underwrite insurance for one year and at the end of three years are to be "wound up", with any outstanding liabilities and/or assets insured into a succeeding year's syndicate. When a Name underwrote "American Business", the premiums he or she would eventually receive were to be deposited with Citibank into a trust fund for that Name to pay any claims arising under the American Business. The remainder, after operating expenses, was to be paid to the Name. The profits were only distributed to the names when each syndicate is wound up. n1

---

n1 Citibank contends that under the terms of the LATD, Lloyd's does not direct Citibank to pay any sums directly to a Name. Rather, if any surplus remains in the LATF after Lloyd's has directed the payment of all claims and accounted for all necessary expenses and reserves, Lloyd's may direct Citibank to remit such surplus to the Premiums Trust Fund pursuant to the terms of the LATD. These funds may or may not eventually be remitted to an individual Name as profit depending upon whether the Name's worldwide participation in the Lloyd's insurance market in any given year of underwriting results in a net positive or negative balance.

---

[*9]
According to the LATD, a separate trust fund was supposed to be established for each Name and each annual syndicate -- thus, if a Name was on ten different syndicates in 1991 and twenty syndicates in 1992, the Name should have thirty separate accounts. Further, although the trustee was allowed to commingle the trust funds for investment purposes, plaintiffs contend that this practice does not derogate from the fundamental premise that each trust has different beneficiaries.

### C. Reconstruction And Renewal

In the fall of 1996, Lloyd's underwent a corporate reorganization and recapitalization known as the "Reconstruction and Renewal" plan ("R&R"). Pursuant to R&R, Lloyd's formed Equitas, a corporation to reinsure risks relating to underwriting for years 1993 and prior, after Lloyd's determined they were otherwise uninsurable. R&R involved the transfer of trust fund assets related to such underwriting from the LATF to Equitas. These funds would then be jointly and severally liable for all claims arising thereunder. In the event that Equitas is unable to pay any claim, each Name would remain liable for the policies he or she underwrote. The U.K. Department of Trade and Industry [*10] and the New York Insurance Department approved R&R on September 3, 1996.

In accordance with the R&R plan, Lloyd's (1) offered Names "finality" -- or a final reckoning of their underwriting liabilities -- as set forth in several "indicative finality statements" and a subsequent "finality statement," and (2) extended individual settlement offers to each Name. Over 90 percent of all Names have accepted Lloyd's settlement offer and have thereby irrevocably released Lloyd's and a number of entities involved in the Lloyd's market, specifically including Citibank, and granted Lloyd's power of attorney to enter a dismissal of any complaint filed against a released party. The remaining non-accepting Names number approximately 1,700.

### II. THIS LITIGATION

#### A. Plaintiffs' Allegations

Plaintiffs allege that Citibank, as trustee of the LATF, breached its fiduciary duty by, among other things: (1) failing to abide by the terms of the trust agreement, including (a) failing to establish individual trust accounts as instructed by the trust deed, (b) commingling the monies of individual trust funds, (c) improvidently making loans on behalf of beneficiaries who had no obligation [*11] to make such loans and without sufficient information to know whether those loans could be repaid by the borrower, and (d) failing to maintain records of the monies it holds on behalf of each beneficiary; (2) failing to inform the Names of impending loses resulting from asbestos and pollution liabilities of which it was aware and of the inter-Name loans; and (3) self dealing by, among other things, acquiescing and participating in a purported amendment to the trust deed to insulate Citibank from liability to the beneficiaries, and preferring itself over its beneficiaries by repaying itself on a loan to a syndicate before certain

Case 1:05-cv-00317-GMS    Document 33-4    Filed 08/02/2005    Page 5 of 16

1998 U.S. Dist. LEXIS 1199, *                                          Page 4

syndicates in the LATF were repaid on loans made to the same syndicate.

The inter-Name loans, according to the plaintiffs, resulted from a need to finance the shortfall in funds available in certain trust accounts to pay their claims. n2 The loans were allegedly improvident since Citibank did not accurately assess the risk of such loans. Citibank should have known the risk since, inter alia, the Central Funds-United States and the Central Funds-United States II (together, "CFUS"), which may be used to pay such shortfalls, are on deposit at Citibank. Moreover, [*12] plaintiffs contend that Citibank was familiar with large impending losses for certain syndicates from asbestos and other environmental liabilities. Plaintiffs allege that substantial amounts of these loans are unpaid and uncollectible.

> n2 The shortfall should have been met, according to plaintiffs, by payment of cash calls, a drawdown on the defaulting Name's deposit, or an application for cash from the CFUS, which may be used for such purposes at the discretion of Lloyd's Council.

Plaintiffs seek restoration of "misappropriated monies," recovery of any damages suffered, an injunction preventing Citibank from continuing to violate fiduciary obligations, and a declaration that the LATD amendment is null and void.

### III. THE PROPOSED CLASS

Plaintiffs seek to certify the following class:

> All former and current Underwriting Members of the Society of Lloyd's who underwrote American Business and who have been damaged by the conduct of Citibank in breaching its fiduciary duties as trustee of the Lloyd's [*13] American Trust Funds, excepting those persons who have expressly agreed to Lloyd's offer of settlement in connection with its plan for Reconstruction and Renewal, and excluding defendant's officers and directors.

According to Lloyd's, as of July 22, 1997, all but approximately 1,700 Names have accepted the R&R settlement offer. Non-U.S. Names represent more than two-thirds of the approximately 1,700 non-accepting Names, who reside in 55 countries. The single largest group of proposed class members resides in the United Kingdom: 667 Names, which would account for 39 percent of the proposed class. United States Names would comprise about one-third of the proposed class.

### IV. THE PROPOSED CLASS REPRESENTATIVES

#### A. Mark Rose

Mark Rose ("Mr. Rose") joined Lloyd's in 1979. He resigned, along with his wife, plaintiff Elice Joy Rose ("Ms. Rose"), in 1995. He is also a member of the American Names Association. Mr. Rose lives in Blue Point, New York, graduated from Siena College in 1965 and is now a beer wholesaler.

#### B. Elice Joy Rose

Ms. Rose joined Lloyd's in 1986 (the year she and Mr. Rose were married) because Mr. Rose thought "it was a good idea" and [*14] "would keep [her] busy." She continued to participate in Lloyd's as an active underwriting Name, through her and her husband's member's agent, Sedgwick Lloyd's Underwriting Agents Limited ("Sedgwick"), until 1995, when she and her husband simultaneously resigned.

Mrs. Rose lives with her husband in Blue Point, New York. She is not currently employed, although she worked as a merchandise manager for a retail clothing chain until 1986. She is a graduate of St. Joseph's College, having earned her degree in human resources in 1989.

#### C. Philip Stamm

Mr. Stamm is a lawyer and lives in New York City. He attended Syracuse University for college and law school, graduating in 1980 and 1984, respectively. Members of Mr. Stamm's family, which owns Stamm International, Inc., a heating and cooling manufacturing concern based in New Jersey, encouraged him to become a member of Lloyd's in 1980, while he was still in college. Mr. Stamm's father, Arthur Stamm, his sister, Maureen Olivo, and his brother, Jeffrey Stamm, were all Names. Mr. Stamm reinsured his Lloyd's exposure through a reinsurance subsidiary of Stamm International, Inc., Powrmatic, S.A. Mr. Stamm resigned from Lloyd's in [*15] 1986.

### Discussion

### I. Standard for Certifying Class Action

*Rule 23(c)(1), Fed. R. Civ. P.*, provides: "As soon as practicable after the commencement of an action brought as a class action, the Court shall determine by order whether it is to be so maintained." In applying this Rule, courts have held that class action determinations are to be based solely on the allegations set forth in the complaint, which are accepted as true, see *Shelter Realty*

Case 1:05-cv-00317-GMS    Document 33-4    Filed 08/02/2005    Page 6 of 16

1998 U.S. Dist. LEXIS 1199, *                                                                                    Page 5

*Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978), and not on an inquiry into the merits of the plaintiffs' claims. See *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974); *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 94 (S.D.N.Y. 1981).

The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation. See *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208-09 (2d Cir. 1972); *Green v. Wolf Corp.*, 406 F.2d 291, 298, 301 (2d Cir. 1968). However, despite the liberal interpretation that this Court must give to Rule 23, it may certify this as a class action only after [*16] undertaking "rigorous analysis" to assure that the requirements of the Rule are satisfied. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982).

**II. Rule 23(a) Requirements are Met**

*Rule 23(a) of the Federal Rules of Civil Procedure* provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

If these four criteria are not met, an action may not be maintained as a class action. *Fed. R. Civ. P. 23(b)*. Each of these criteria is considered in turn below.

**A. Numerosity and Impracticability**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Impracticability means difficulty or inconvenience of joinder; the rule does not require impossibility of joinder. [*17] See *Northwestern Nat. Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 509 (S.D.N.Y. 1984); *Goldstein v. North Jersey Trust Co.*, 39 F.R.D. 363, 367 (S.D.N.Y. 1966).

There is no magic minimum number that breathes life into a class. See *Bruce v. Christian*, 113 F.R.D. 554, 556 (S.D.N.Y. 1986). Courts in this circuit have held that classes far smaller than the one proposed here are sufficiently numerous for class certification. See, e.g., *Korn*, 456 F.2d at 1209 (certifying class which may be limited to 70 investors); *McNeill v. New York City Hous. Auth.*, 719 F. Supp. 233, 252 (S.D.N.Y. 1989) (1,059 Section 8 tenants whose subsidies were suspended or terminated); *Fidelis Corp. v. Litton Indus., Inc.*, 293 F. Supp. 164, 170 (S.D.N.Y. 1968) (certifying class of 35-70 individuals).

Here, the class numbers approximately 1,700. A class of this size plainly makes joinder of all members impracticable, if not impossible. Therefore, the numerosity requirement is satisfied.

**B. Commonality**

Rule 23(a)(2) requires that there must "questions of law or fact common to the class." In their Complaint, plaintiffs identify several common questions of law and fact, including [*18] whether Citibank has breached its fiduciary duty to the class by:

1. failing to keep adequate records relating to their trust funds;

2. failing to institute proper internal and supervisory controls to ensure the protection and maintenance of the res of the class members' trust funds;

3. engaging in a pattern of improperly loaning monies from the trust funds of solvent Names to pay the claims owed by insolvent Names; and

4. preferring itself at the expense of the class members.

Citibank does not dispute that these common issues exist, but rather that they do not predominate over individualized issues, which is necessary for the certification sought here. See *Fed. R. Civ. P. 23(b)(3)*. Accordingly, the commonality requirement is met for the purposes of satisfying paragraph (a), and the predominance issue will be addressed below.

**C. Typicality**

Rule 23(a)(3) requires that the "claims . . . of the representative parties [be] typical of the claims of the class." Typicality refers to the nature of the claim of the class representatives, and the proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct [*19] not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct. See *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986); *German v. Federal Home Loan Mortgage Corp.*, 885 F. Supp. 537, 554-55 (S.D.N.Y.), clarified on reargument, 896 F. Supp. 1385 (S.D.N.Y. 1995);

*Maywalt v. Parker & Parsley Petroleum Co., 147 F.R.D. 51, 57 (S.D.N.Y. 1993); Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 200 (S.D.N.Y. 1992); Dura-Bilt Corp., 89 F.R.D. at 99.*

The plaintiffs in this action, like every other member of the proposed class, are Names whose funds were held by Citibank in the LATF pursuant to the LATD. All of the claims are based on the same legal theories; that they have been injured by Citibank's breach of fiduciary duties.

Although Citibank does not dispute the typicality of Mr. or Ms. Rose's claims, they contend that Mr. Stamm's claim is not typical on two grounds, each of which is discussed below. [*20]

First, Citibank contends that Mr. Stamm is subject to a unique defense because he reinsured his Lloyd's related losses, and therefore his damages, unlike those of other plaintiffs, were, or could have been, reimbursed. Thus, according to Citibank, Mr. Stamm suffered no damages.

In Maywalt, this Court held in a securities fraud class action context that where the "underlying facts giving rise to [the] action are the same and . . . the claims . . . are based on identical legal theories," the "differences regarding damages among class members is not sufficient to defeat class certification." *147 F.R.D. at 56-57.* Similarly, in *Shelter Realty Corp. v. Allied Maintenance Corp., 75 F.R.D. 34 (S.D.N.Y. 1977),* the court held that the potential for plaintiffs to show individual damages does not defeat the commonality requirement for class certification. *Id. at 37-38.* If liability is found it may be necessary to separately determine the damages suffered by individuals in the class, yet this does not defeat certification. See *Green, 406 F.2d at 300-301.*

The individualized damage issue here does not undermine Mr. Stamm's claim that Citibank is liable, and can not defeat certification. [*21] The Court, therefore, need not reach the issue of whether Mr. Stamm's reinsurance agreement affects his damages in this case. Here, the facts giving rise to Mr. Stamm's claim and the legal theory upon which he relies is not affected by his reinsurance contract. Accordingly, the effect of the reinsurance contract, if any, on the damages Mr. Stamm incurred does not defeat his application to be a class representative.

Second, Citibank contends that Mr. Stamm caused at least part of his loss by ignoring his member's agent's advice to withdraw from a certain Syndicate in 1983, and remaining in the Syndicate through 1985. Therefore, they assert, Mr. Stamm is subject to a unique defense.

However, as plaintiffs contend, Citibank does not allege that the member's advice to withdraw was premised on Citibank's breach of fiduciary duty, nor that he had notice of Citibank's alleged breaches of fiduciary duty. Therefore, Mr. Stamm's decision to remain in the syndicate, and thereby assume continued underwriting risk, cannot be the legal cause of damages pursuant to the instant claims against Citibank.

### D. Adequacy of Representation

Rule 23(a)(4) requires that the class representatives [*22] be adequately representative of the class. The Supreme Court has held that plaintiffs must satisfy a two-pronged test to qualify as adequate representatives: (1) the representatives' interests must not conflict with the class members' interests, and (2) the representatives and their attorney must be able to prosecute the action vigorously. *General Tel. Co., 457 U.S. at 157 & n.13; Dean v. Coughlin, 107 F.R.D. 331, 334 (S.D.N.Y. 1985).*

#### 1. Absence of Conflict

##### a. Inter-Name Loan Conflict Does Not Defeat Adequacy of Class Representatives

One of the several claims against Citibank is that they breached their fiduciary duty by permitting loans from solvent Names to insolvent Names -- or, as the parties have characterized the claim, by robbing Peter to pay Paul. Citibank contends that the class definition, which includes in the class all Names worldwide who underwrote American Business and have not accepted the R&R settlement offer, necessarily includes both Peters and Pauls. The interests of the Peters and Pauls, according to Citibank, are in open conflict, and therefore cannot be certified as a class.

The conflict, according to Citibank, arises from plaintiffs' [*23] demand that the funds improvidently taken without consent be restored to the trust funds from which they were removed. Citibank reasons that the "restoration" of these amounts would necessarily require debiting the trust funds of the insolvent Names (the Pauls) or, perhaps, pursuing them for collection, thereby resulting in the conflict.

Plaintiffs, on the other hand, contend that the conflict is illusory. First, the restitution would be from Citibank, not the class members. Second, they contend that every Name is interested in establishing Citibank's liability. Finally, they contend that any class member who believes that his or her rights are antagonistic to those of the class as certified will receive notice of the action pursuant to *Fed. R. Civ. P. 23(c)(2)* and will have the right to opt-out of the class.

Although it is possible that a conflict will develop between the Peters and Pauls, the situation here is distinguished from the cases Citibank relies upon which present palpable conflicts. See *Epifano v. Boardroom*

Case 1:05-cv-00317-GMS    Document 33-4    Filed 08/02/2005    Page 8 of 16

1998 U.S. Dist. LEXIS 1199, *                                        Page 7

*Bus. Products, Inc.*, 130 F.R.D. 295, 299 (S.D.N.Y. 1990) (proposed class member inadequate since her husband or husband's business is potential defendant); [*24] *Block v. First Blood Assoc.*, 691 F. Supp. 685, 694 (S.D.N.Y. 1988) (class members' interest in preserving tax deduction at odds with proposed class representative's litigation posture); *Maynard, Merel & Co., Inc. v. Carcioppolo*, 51 F.R.D. 273, 277-78 (S.D.N.Y. 1970) (proposed class representatives held unique rights which might incent towards favoring different type of relief than those class members without such rights); *Carroll v. American Fed'n of Musicians of U.S. and Canada*, 372 F.2d 155, 162 (2d Cir. 1967), vacated, 391 U.S. 99 (1968) (certain class members may favor challenged union policy).

Citibank has not demonstrated that a conflict among class members exists here, and therefore it is premature to decide this issue now. As plaintiffs contend, no Name can at this point in the litigation know with certainty whether he or she was more of a Peter or a Paul. Moreover, Citibank does not contend that there is a conflict on any of the other theories of liability in this case. Further proceedings in this litigation may reveal the nature of any potential liability of certain class members resulting from proof of Citibank's liability. It is possible, for example, that [*25] the litigation strategy of class members harmed by the loans would differ from those harmed by other breaches of Citibank's fiduciary duty. See *Maynard*, 51 F.R.D. at 277-78. If a conflict develops, the class could divided into subclasses, or the court can exclude them from the class at a later time. See Fed. R. Civ. P. 23(c)(1) (order may be amended) & 23(c)(4)(B) (providing for subclasses); *County of Suffolk v. Long Island Lighting CO.*, 710 F. Supp. 1407 (E.D.N.Y. 1989) (Weinstein, J.).

**b. Mr. Stamm's Lloyd's Action Does Not Create Conflict At This Time**

Citibank contends that Mr. Stamm's role in a separate action against Lloyd's presents a conflict of interest that disqualifies him as a class representative. See *Stamm v. Corporation of Lloyd's*, No. 96 Civ. 5158 (SAS) (the "Lloyd's action"). In the Lloyd's action, Mr. Stamm, his father and his sister have sued Lloyd's for fraudulently inducing them to join Lloyd's and continuing to defraud them during their tenure as Names at Lloyd's. Specifically, the Stamms allege that Lloyd's breached a fiduciary duty owed to them and other Names by commingling Names' funds held in, and failing to disclose material information [*26] regarding, the LATF. In the instant action, Mr. Stamm asserts that Citibank breached a fiduciary duty owed to the class by, among other things, commingling Names' funds in, and failing to disclose that and other material facts concerning, the LATF.

Thus, Citibank contends, conflicts are likely to arise from the fact that Mr. Stamm contends in his Lloyd's action that Lloyd's is responsible for his Lloyd's-related losses and in this action, on the other hand, that Citibank is responsible for those losses. Conflicts may arise, Citibank contends, because (1) his statements in the Lloyd's action would be admissions in this case; (2) his positions in the Lloyd's action may detrimentally influence his positions here; (3) his settlement objectives here may be compromised by potential recoveries in the Lloyd's action; (4) he could be collaterally estopped from litigating certain issues here if they are previously decided in the Lloyd's action, thereby prejudicing the class members' rights.

Moreover, as plaintiffs' concede, the issue is not moot. Although the action was dismissed, see *Stamm v. Corporation of Lloyd's*, 1997 U.S. Dist. LEXIS 11258, No. 96 Civ. 5158, 1997 WL 438773 (S.D.N.Y. Aug. 4, 1997), the dismissal [*27] has been appealed.

Plaintiffs contend that since Citibank is not a defendant in the Lloyd's action, there is no conflict here. Different defendants, however, does not obviate the potential for a conflict to arise. However, there is no present conflict, and the potential for a conflict is too speculative at this point to disqualify Mr. Stamm. Of course, if a conflict does develop at a later time, he could be decertified.

**2. Qualification of Class Representatives**

**a. Class Representatives Are Not Inadequate For Failure to Furnish Information**

Citibank contends that plaintiffs are inadequate because they have not cooperated with legitimate discovery requests, including not producing relevant documents and not agreeing to waive their confidentiality agreement with Lloyd's. Citibank contends that its request that plaintiffs consent to Lloyds turning over certain documents is proper because such information is needed by both plaintiffs and Citibank. Plaintiffs allege that Citibank did not keep records indicting whose trust funds were credited, and whose were debited, when inter-Name loans took place. Therefore sorting out the amounts held by each plaintiff, Citibank [*28] contends, would require access to Lloyd's confidential records, which the named plaintiffs refused to provide. Further, plaintiffs require the information to establish how such loans may have affected each plaintiff, as well as to calculate their damages. Finally, Citibank requires the information to substantiate various defenses, including (1) plaintiffs suffered no injury from Citibank's alleged failure to keep records, because Lloyd's and the agents kept detailed and sufficient records reflecting all transactions in the LATF; and (2) the records show that plaintiffs suffered no losses as a

Case 1:05-cv-00317-GMS    Document 33-4    Filed 08/02/2005    Page 9 of 16

1998 U.S. Dist. LEXIS 1199, *                                                Page 8

result of any purported inter-Name loans. Openness, they contend, is an indicia of the adequacy of class representatives, and therefore these plaintiffs are inadequate.

Second, Citibank contends that Plaintiffs have not provided relevant documents upon request.

Plaintiffs, on the other hand, contend that they have produced all documents in their possession relating to Lloyd's, have sat for extended depositions, and that the documents not produced relate only to non-Lloyd's documents such as tax returns which, they contend, are protected by a privacy right. Furthermore, they contend that they [*29] need not agree to the far-reaching confidentiality waiver that Citibank requested. Moreover, they contend that Citibank has refused to provide any Lloyd's material, and therefore the one-sided demand was not proper.

Class representatives owe a fiduciary duty to the other class members. See *Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 549, 93 L. Ed. 1528, 69 S. Ct. 1221 (1949)* (class representative is volunteer who assumes position of fiduciary nature); *Kline v. Wolf, 88 F.R.D. 696, 700 (S.D.N.Y. 1981)*, aff'd, *702 F.2d 400 (2d Cir. 1983)* (class representative serves as fiduciary to advance and protect interests of those he purports to represent). This duty, however, does not impose upon plaintiffs the obligation to unilaterally and informally reveal all information in their control which is requested by Citibank. The Federal Rules of Civil Procedure provide the authority whereby Citibank may obtain discovery, as well as the procedures to compel such production if the plaintiffs are not forthcoming. Plaintiffs, of course, can oppose a motion to compel or seek a protective order. The inference that Citibank seeks here, that plaintiffs' refusal to submit to an informal [*30] and broad waiver of its confidentiality agreement with Lloyd's amounts to a showing that plaintiffs will breach their duty to comply with proper discovery requests, simply cannot be made.

The facts here are distinguished from the cases relied on by Citibank. In *Norman v. Arcs Equities Corp., 72 F.R.D. 502 (S.D.N.Y. 1976)*, the failure to "comply wholeheartedly and fully with the discovery requirements of modern federal practice," which served as one of several grounds for denying class certification, consisted failure to answer deposition questions responsively and directly. *Id. at 506*. For example, the proposed class representative provided "garbled" testimony while exploring the nature, extent and origin of his dispute with the defendant, revealing only that his adverse judgment of defendant's character resulted from a "sighting" of him at a bar mitzvah. This testimony prompted the court to conclude that "selecting a person [as class representative] believing himself possessed of such occult powers" could not be justified. Id.

In Darvin, although the lack of any detail regarding the plaintiff's "refusal to answer relevant questions at both sessions of his deposition" [*31] makes it difficult to assess the similarity in these cases, *Darvin v. International Harvester Co., 610 F. Supp. 255, 257 (S.D.N.Y. 1985)*, the facts which are related distinguish the cases. The plaintiff, for example, changed his answer relating to a material element of the claim several times in the same deposition. *Id. at 257* (credibility relating to reliance on alleged misrepresentation "could become focus of . . . unique defenses at trial").

Here, Plaintiffs have not provided inconsistent testimony or avoided direct answers to legitimate relevant questions, much less reached the level of obfuscation found in Norman or Darvin.

**b. Ms. Rose Is Not Sufficiently Familiar With The Case To Act As Class Representatives**

Where a plaintiff brings an action representing only herself, her degree of familiarity with the case is not the court's concern. However, where a plaintiff seeks to represent a class, the court must certify that the plaintiff will "fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)*. Whereas the plaintiff's decisions at critical stages of the litigation in the individual case affect only her own result, the class [*32] representative's decisions affect absent-class members, and therefore the structural protections afforded by adhering to the Rule 23 requirements are necessary to protect those interests. See *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 138 L. Ed. 2d 689, 117 S. Ct. 2231, 2248, 2251 (1997)* (structural protection of each class member's interests provided by the carefully crafted requirements of Rule 23 must be preserved to "fairly" bind absent members by decisions of class representatives). An integral component of a class representative's "adequacy", therefore, must be a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation.

Moreover, the nature of the case, which frames the potential class representatives, must be part of the threshold calculus. An adequate representative of a class of prisoners or school children, for example, establishes a different threshold than a class of sophisticated investors. To hold otherwise could undermine the legitimate right of plaintiffs to bring a case as a class action.

Plaintiffs contend that in complex cases the class representative is [*33] not expected to be knowledgeable enough to assist counsel in devising

sophisticated legal strategy or investigating claims and conducting discovery. It is not legal strategy, however, that plaintiffs are expected to provide, but rather reasonably informed decision-making. The "startlingly unfamiliar" standard advanced by plaintiffs, n3 in the context of the sophisticated financial investments at stake here, sets the threshold too low to meet the demands of ensuring adequate representation for absent class members.

> n3 Plaintiffs cite *Biancur v. Hickey*, No. C 95-2145, 1997 WL 9857 at *9 (N.D. Cal. Jan. 7, 1997) for the proposition that "the threshold of knowledge required to qualify as a class representative is low; a party must be familiar wit the basic elements of her claim, and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case."

Citibank contends that Ms. Rose is unfamiliar with her affairs at Lloyds and this litigation, and therefore she is not fit to represent the proposed [*34] class. Citibank cites numerous basic terms and concepts that she should be expected to know regarding Lloyd's, and which appear in the "Relevant Facts" section of the Complaint. n4 She also has no recollection, or is unsure, of many matters concerning her own personal affairs at Lloyd's. n5 Moreover, Ms. Rose is unfamiliar with important aspects of this litigation. For example, she did not know of any papers filed in this action other than the complaints, and therefore was unfamiliar with significant events such as Citibank's motion to dismiss, plaintiffs' motion to remand to state court, or the New York Insurance Department's Report on Examination of Lloyd's.

> n4 Ms. Rose, for example, was not familiar with key terms in this case, including the LATF, the LATD, The General Undertaking, the members' agent's agreement, and the Lloyd's deposit, despite having signed the General Undertaking, a member's agent's agreement, and having posted a letter of credit as a deposit. Nor could she identify the Society of Names, the Council of Lloyds, the Corporation of Lloyd's, the Lloyd's Central Fund, or the R&R. [*35]

> n5 Ms. Rose had no recollection of, or was unsure of, whether she has a Lloyd's Deposit, whether she owes money to Lloyd's, whether Lloyd's has sued her, whether she had to fill out forms to become a Name, whether she ever changed syndicates from one year to the next, or whether her Lloyd's letter of credit is still outstanding.

Plaintiffs contend that Ms. Rose's knowledge of the Lloyd's market is irrelevant, since it is Citibank's conduct which is at issue here. The terms of the Lloyd's American Trust Deed, which is central to plaintiffs' claims, however, cannot be adequately understood if separated from its context, namely, the Lloyd's insurance market. Therefore, the facts with which Ms. Rose is unfamiliar are related to this case. Accordingly, Ms. Rose's lack of familiarity with the mechanics of the Lloyd's insurance market, her dealings with Lloyd's, and this litigation render her an inappropriate representative this class. Plaintiffs' application to certify Ms. Rose as a class representative is therefore denied.

### c. Mr. Rose Does Not Lack Credibility Rendering Him An Unfit Class Representative [*36]

Citibank claims that Mr. Rose similarly lacks sufficient familiarity with the case to qualify as a class representative, and also lacks credibility. n6 Here, however, Mr. Rose's alleged lapses in familiarity are minor, consisting of a misunderstanding of the definition of "American Business" and misstating the class definition as limited to American Names, whereas the complaint had been amended to include all Names worldwide. Considering the complexity of the mechanics of the Lloyd's insurance market and this litigation, these lapses are not significant.

> n6 Citibank also attacks Ms. Rose's credibility. However, since she is insufficiently familiar with the case to qualify as a class representative, the Court need not reach the credibility issue with respect to Ms. Rose.

Mr. Rose's familiarity with this case is not insufficient either. Citibank cites no evidence that Mr. Rose failed to provide informed decision-making when necessary to adequately litigate this case. In a complex case such as this, it is not [*37] reasonable to expect a plaintiff to recite every motion made and its result or every discovery device served. Although it is surprising that he could not recall the name of his co-plaintiff, Mr. Stamm, this alone is not sufficient to render him an inadequate representative.

Citibank's contention that Mr. Rose must be disqualified due to credibility issues is also without merit. Although demonstrating the lack of credibility of a plaintiff on a material element of the claim or a possible

defense may render the proposed class representative inadequate, see *Panzirer v. Wolf, 663 F.2d 365, 368 (2d Cir. 1981)*, vacated as moot, *459 U.S. 1027 (1982); Kline v. Wolf, 88 F.R.D. 696 (S.D.N.Y. 1981)*, aff'd, *702 F.2d 400 (2d Cir. 1983); Weinstein v. American Biomaterials Corp., 123 F.R.D. 442, 446 (S.D.N.Y. 1988)*, there is no such showing here.

Citibank contends that Mr. Rose has not been candid with respect to questions about whether he was involved with Ms. Rose's Lloyd's affairs and with respect to several responses during his deposition that he did not recall the answer to specific questions. This is not a case, as in the precedents relied upon by Citibank, where Citibank [*38] contends that serious questions of credibility give rise to a likelihood that the class representative would be subject to a unique defense. The generalized attacks on Mr. Rose's credibility, each of which plaintiffs refute with plausible explanations, do not disqualify Mr. Rose.

### d. Mr. Stamm's Decision to Bring This Lawsuit and His Involvement In Managing Lloyd's Affairs Does Not Render Him Inadequate

Citibank contends that Mr. Stamm has blindly relied upon his attorneys, and therefore is inadequate to represent the class. Citibank draws this inference from their allegation that Mr. Stamm was recruited by the attorneys to represent the class.

Although, as discussed above, an application to be certified as a class representative may be defeated by showing that the plaintiff is not likely to make reasonably informed decisions, Citibank has not demonstrated such a failure with respect to Mr. Stamm. Indeed, Mr. Stamm, a licensed attorney in New York State, demonstrated a strong command of the facts and legal issues involved in this action, as well as an understanding of his role and duties as class representative. Accordingly, Citibank's contention is without merit.

Finally, [*39] there is no basis for Citibank's contention that the assistance Mr. Stamm received from his sister and father in managing his Lloyd's affairs renders him inadequate. Mr. Stamm's command of the legal issues and facts belie Citibank's contention that he is not sufficiently interested or lacks sufficient personal knowledge of the events from which Citibank's liability may arise.

## III. Rule 23(b)(3) Requirements Are Met

### A. Common Issues Predominate

To certify a class action under Rule 23(b)(3), a court must find that "the questions of law or fact common to the members of the class predominated over any questions affecting only individual members." The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless. *Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n., 68 F.R.D. 49, 52 (E.D.N.Y. 1975)*.

Individualized questions regarding the extent of each class member's damages will not usually defeat certification. See *Eisen, 391 F.2d 555 at 566, In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 382 (S.D.N.Y. 1996)*; see also *Blackie v. Barrack, 524 F.2d* [*40] *891, 909 (9th Cir. 1975); In re Nasdaq Market-Makers Antitrust Litig., 169 F.R.D. 493, 513-14 (S.D.N.Y. 1996)* (predominance not defeated by potential conflict in way buyers and sellers would show damages). Moreover, the existence of "slight differences in class member's positions" does not bar finding predominance of common issues where "a defendant's course of conduct is in its broad outlines actionable." *Blackie, 524 F.2d at 902.* For example, in Klamberg v. Roth, the court certified that common issues predominate because "proof of conduct constituting a breach of fiduciary duty or a breach of the Trust Agreement is likely to be the same for all beneficiaries' claims." *Klamberg v. Roth, 473 F. Supp. 544, 558 (S.D.N.Y. 1979).* The court stated that plaintiff's claims "arise solely from the acts of the defendants directed towards all of the beneficiaries, and are not merely typical of the claims of other beneficiaries, but are the same." *Id.*

Citibank contends that there are two groups of individual questions which predominate here: (1) whether a Name is a lender or a borrower; and (2) what each Name knew about the underwriting losses he or she faced. The first issue [*41] requires detailed analysis of what was done with each Name's funds. Since each Name may have participated in several of the more than 400 Lloyd's syndicates in any given year in which that Name underwrote at Lloyd's, this analysis is a significant undertaking. However, contrary to Citibank's suggestion, this exercise is primarily one of damages and, however complicated, the existence of such issues does not defeat the predominance of the common issue of whether Citibank's course of conduct results in liability.

The second group of individualized issues concerns whether Citibank's alleged failure inform the Names of impending loses resulting from asbestos and pollution liabilities and of the inter-Name loans caused certain underwriting losses. Citibank contends that plaintiffs' decision to put at issue the cause of underwriting losses opens the door for trial of the cause of each Name's individual circumstances. Citibank contends that plaintiffs may have known, or should have known, the potential liabilities involved in participating in Lloyd's, as well as information from other sources concerning

Case 1:05-cv-00317-GMS    Document 33-4    Filed 08/02/2005    Page 12 of 16

1998 U.S. Dist. LEXIS 1199, *                                                                    Page 11

asbestos and pollution liability. It so, Citibank contends, even if they did violate [*42] a fiduciary duty to disclose such information, the violation may not have caused the underwriting losses. See *Schulman v. Jarcho, 49 N.Y.2d 880, 881-82, 427 N.Y.S.2d 939, 405 N.E.2d 184 (1980)*.

While such individualized issues do exist, the common issues still predominate. Each class member has an interest in determining whether Citibank's conduct breached their fiduciary duty. This conduct affected all class members and was not specifically directed at any one of them. If liability is found, then individual questions, including possibly whether a particular class member's underwriting losses were not caused by Citibank's lack of disclosure, will need to be determined. This does not, however, defeat certification pursuant to Rule 23(b)(3).

### B. Superiority

Rule 23(b)(3) requires plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Citibank contends that a class action is an inferior means of adjudication where the class members would not be barred from relitigating their claims in foreign courts.

Here, Citibank contends, two-thirds of the approximately 1,700 class members who [*43] reside outside the United States would not be subject to res judicata. n7 Citibank would thus be bound by a judgment in the class's favor, but up to two-thirds of the plaintiff class would not be bound by a judgment in Citibank's favor. Citibank contends this outcome is unfair and, because of the possibility of having to litigate the case again abroad, is an inefficient use of judicial resources. Indeed, Citibank contends, even if the plaintiffs were to win he could relitigate in his home court in hopes of a more generous recovery there, thereby taking "two bites of the apple."

---

n7 Citibank provides as evidence the declarations of foreign counsel, which in sum conclude that many, if not all, of the foreign Names could sue Citibank a second time in their home jurisdictions on the very same claims, even if they are unsuccessful here. The law surveyed includes five jurisdictions, which are France, England, South Africa, Canada, and Switzerland, and which represent approximately 58 percent of the proposed class.

---

[*44]

Plaintiffs, on the other hand, contend that a class action is superior to any other method because it will produce a res judicata affect on any further litigation in the United States, and will have evidentiary value in any subsequent proceedings in foreign courts. The significant number of United States Names alone would be sufficient to find that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy," as required by Rule 23(b)(3). Furthermore, Citibank's affidavits regarding foreign law do not compel the conclusion that a judgment in the United States would have no value in a foreign court. This is an action against a trustee for breach of its fiduciary duty under New York State law, where the trust res is situated in New York, and the situs of all the alleged wrongful acts occurred in New York. Accordingly, a foreign court may look to the results achieved here for guidance, thereby contributing to the superiority of the class action procedure.

Furthermore, while plaintiffs may not be bound to a decision in Citibank's favor, if Citibank is found liable, or if the case is settled, the Court can fashion a proof-of-claim [*45] mechanism which would likely bind any participating class member and thereby discourage relitigation in the hope of a more favorable settlement.

Citibank's reliance on *Bersch v. Drexel Firestone, Inc., 519 F.2d 974 (2d Cir. 1975)*, is misplaced. In Bersch, the issue was whether to allow the action to proceed as a class action on behalf of the foreign members of the class under principles of pendent jurisdiction. *Id. at 993*. The court decided that federal securities laws did not apply to the foreign class members in that particular case, leaving only state claims against the foreign class members. *Id. at 993*. The court held that the issue of res judicata was one of five issues the court should consider in deciding whether to exercise its discretion to maintain pendent jurisdiction. n8 *Id. at 996*. Therefore, Bersch did not consider the question here, which is whether the class action is superior, nor did it decide that the res judicata effect in foreign jurisdictions is dispositive of the issue it did consider.

---

n8 The other four issues were: (1) the size of the foreign members' claims relative to the American class members' claims; (2) the need to apply the law of up to fourteen different nations; (3) the lack of domestic impact of the substantially foreign transactions; and (4) the burden imposed by the large class size and the entirely foreign character of the transaction.

---

[*46]

Factual and legal differences also distinguish *CL-Alexanders Laing & Cruickshank v. Goldfeld, 127 F.R.D. 454 (S.D.N.Y. 1989)*, upon which Citibank relies. CL-Alexanders was a securities fraud action brought by

Case 1:05-cv-00317-GMS    Document 33-4    Filed 08/02/2005    Page 13 of 16

1998 U.S. Dist. LEXIS 1199, *                                    Page 12

a London investment bank on behalf of a class of twenty-five British citizens and institutions who purchased in Great Britain the stock of a Delaware corporation. *Id. at 454.* In denying class certification the court identified three defects: (1) the low number of class members; (2) lack of typicality of the class representative's claim; and (3) the fact that all class members were British. Here, the plaintiffs seek to certify a class of approximately 1,700 members, over four hundred and fifty of which are United States residents. Furthermore, as discussed above, the class representatives satisfy the typicality requirement. Accordingly, CL-Alexanders does not stand for the proposition that the class action here is not superior.

Finally, the Court does not anticipate that the significant number of non-resident class members will result in unusual management difficulties. Citibank contends that, for example, it is difficult for United States courts to supervise [*47] the process of notice if the notices relating to this action need to be sent in numerous foreign languages. See *Bersch, 519 F.2d at 996 n.47.* However, in the course of ordinary business Lloyd's necessarily communicates with each prospective class member. Moreover, given the capabilities of modern international law firms and the comparative complexities of class action notice procedures, the issue of foreign notice is not sufficiently grave to defeat class certification.

### C. Citibank Is Not Deprived of Due Process

Citibank contends that certifying a class that includes foreign Names may give rise to a violation of Citibank's fundamental due process right. To support its claim, Citibank advances the following syllogism. The prosecution of a class action must be in accordance with the constitutional requirement of due process of law. Cf. *Axel Johnson, Inc. v. Arthur Andersen & Co., 790 F. Supp. 476, 482 (S.D.N.Y. 1992),* aff'd, *6 F.3d 78 (2d Cir. 1993)* ("[A] final judgment affords the parties rights that may be equated to a form of property enjoying due process protection."). Furthermore, Citibank asserts that the doctrines of res judicata and collateral estoppel [*48] are premised on notions of due process and fairness. See *Conte v. Justice, 996 F.2d 1398, 1400 (2d Cir. 1993).* Corporations, as legal "persons," are entitled to due process protection under the Constitution. *Grosjean v. American Press Co., 297 U.S. 233, 244, 80 L. Ed. 660, 56 S. Ct. 444 (1936).* Therefore, Citibank reasons, they would be exposed to the risk of relitigating in foreign jurisdictions the claims that would have been barred by res judicata in the United States, and therefore certification here is constitutionally impermissible.

Citibank supplies no guiding precedent for the proposition that they assert, namely that the possibility that a judgment of a United States court in a class action would have no res judicata effect in foreign courts for a substantial number of class members, nor do we believe there is any. While Citibank is correct in asserting that a class action certification must, in addition to complying with the specific requirements of Rule 23, also comply with the constitutional guarantee of due process of law, there is no such deprivation here.

### IV. Discovery Requests

Pursuant to Rule 26(b)(1), "parties may obtain discovery regarding [*49] any matter, not privileged, which is relevant to the subject matter involved in the pending action." Although the term "relevant" has been construed broadly to encompass any matter that reasonably could lead to the discovery of admissible evidence, discovery is not without ultimate and necessary boundaries. See *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351-52, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978)* (citing *Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947)); Coastal States Mktg., Inc. v. New England Petroleum Corp., 471 F. Supp. 131, 136 & n.10 (S.D.N.Y. 1979).* Rather, the Court has a duty to ensure that discovery requests remain within reasonable limits. See *In re Sur. Ass'n of Am., 388 F.2d 412, 414-15 (2d Cir. 1967); Cresswell v. Prudential-Bache Sec. Inc., 105 F.R.D. 64, 64-65 (S.D.N.Y. 1985).*

### A. The Document Production Cut-Off Shall be 1979

Plaintiffs request documents dating back to 1975, which is calculated as the date when Mark Rose, the named plaintiff with the earliest affiliation with Lloyds, became a Name, plus a four year "baseline" period. Plaintiffs contend the baseline period several years prior to 1979 is necessary [*50] for purposes of comparison. Plaintiffs fail, however, to explain the nature of the comparison they seek, nor its relevance to the subject mater of this action. Accordingly, Citibank shall be required to produce documents starting with 1979.

### B. Citibank's Knowledge of Insurance Risks Is Relevant

Plaintiffs seek documents concerning meetings involving the effect of long-tail risks on the Lloyd's insurance market. Citibank contends that plaintiffs have not demonstrated that knowledge of Lloyd's liability for such risks is relevant to the subject matter of the Complaint, and therefore must be denied. Specifically, Citibank contends that the LATD does not require the trustee to monitor, review, or report on the underwriting risks which may potentially affect Names.

Case 1:05-cv-00317-GMS   Document 33-4   Filed 08/02/2005   Page 14 of 16

1998 U.S. Dist. LEXIS 1199, *                                                                Page 13

However, Citibank concedes that it was their responsibility to invest the funds, and the issue plaintiffs seek to explore is whether it was prudent for Citibank to invest individual Names' trust funds in loans to other Names who were bad credit risks due, among other things, to their potential liability for asbestos and environmental insurance claims. Accordingly, Citibank's knowledge about such risks is relevant [*51] to plaintiffs' theory of liability.

Plaintiffs seek an expanded time-frame for documents related to Citibank's knowledge of Lloyd's asbestos or environmental pollution liabilities. They suggest 1960 is the appropriate cut-off. Citibank contends that this approximately forty year time-frame is unduly burdensome, particularly since plaintiffs do not provide any guidance as to which Citibank employees might possess these documents.

Although choosing a date is somewhat arbitrary, it is reasonable to limit the document request concerning asbestos or environment pollution liability to 1979, which is the year Mr. Rose became a Name and the same date chosen for all other documents. The almost forty year period plaintiffs requested is an undue burden at this time. The 1979 cutoff requires Citibank to review and produce almost twenty years of information, which is a substantial yet reasonable effort considering the allegations made in the Complaint. Plaintiffs may renew their application for an earlier cut-off upon a showing, based upon the discovery granted herein, that such documents are discoverable.

### C. The Document Search Shall Be Limited To LATF Related Organization Units [*52]

Plaintiffs seek to compel Citibank to search its worldwide files, for documents which may comply with its request. Citibank, on the other hand, contends that such a request is unduly burdensome, and that it is reasonable to limit the search to those organization units, departments and individuals it has identified to have had some responsibility for, or interest in, the operation of the LATF.

There is no reason to believe, nor has plaintiff suggested any reason to believe, that any Citibank employee who does not have some oversight responsibility for, or other interest in, the operation of the LATF would generate or receive correspondence relating to its administration. Moreover, evidence which exits outside the scope of this search, if any, is likely to have clues to its existence which lie within the scope of the search, and thereby could provide the basis for a further and more specific discovery request.

### D. CFUS Administration Documents Are Discoverable

Plaintiffs seek documents regarding the establishment and administration of the CFUS funds. Citibank contends that such documents are irrelevant, since the Names have no claim to the amounts held in these two funds. [*53] Although CFUS is funded by assessments on the Names, Citibank contends that the funds are assets of the Society as a whole, and are available at the discretion of Lloyd's as a backstop in its "chain of security" against the possibility that claims would not be paid.

Plaintiffs, however, seek these documents to establish that Citibank knew that the inter-Name loans were improvident since it was aware of the precarious condition of the CFUS, and therefore should have known that it would be an inadequate back stop to assure that the inter-Name loans would be repaid. Accordingly, the CFUS documents are "relevant to the subject matter involved in the pending action." *Fed. R. Civ. P. 26(b)(1)*. Although CFUS reimbursements may appear in the LATF documents produced pursuant to other discovery requests, they might not reveal the full extent of Citibank's knowledge regarding the inter-Name loan credit risk, and therefore is not "unreasonably cumulative or duplicative" and the burden does not outweigh its benefit. See *Fed. R. Civ. P. 26(b)(2)*.

### E. Documents Identifying Citibank Employees Who Were Names Are Relevant and Not Undue Burden

Plaintiffs seek the production of documents [*54] "reflecting, referring to or concerning the involvement of participation or [sic] any current or former Citibank officer, director, employee or agent in the Lloyd's insurance market." In essence, plaintiffs contend that any Name exposed to a "long-tail" risk such as asbestos claims, and therefore threatened with insolvency, would have an incentive to encourage the policy of borrowing from solvent Names to cover such claims. Plaintiffs seek to uncover any Citibank employee participating in Lloyd's as a Name who may have been motivated by this purported conflict of interest.

Citibank contends that this information is irrelevant to any allegations in the Complaint, and therefore is not discoverable. However, as the Supreme Court has noted, relevancy "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, 437 U.S. at 351* (citing *Hickman, 329 U.S. at 499-501*). Moreover, "discovery is not limited to issues raised by the pleadings, for discovery itself is designated to help define and clarify the issues." Id. (citing *Hickman, 329 U.S.* [*55] *at 500-501*). See also *In re Sur. Ass'n of Am., 388 F.2d at 414* ("Thus it is relevancy to the subject

matter which is the test and subject matter is broader than the precise issues presented by the pleadings."). Accordingly, although the employee information plaintiffs seek may not be relevant to an allegation in the Complaint, its relevance to the subject matter involved in action is sufficient for discoverability purposes.

Citibank further contends that they have not routinely compiled such information, and its production would require a survey of its 90,000 current employees world wide, and as many as 255,000 employees dating back to 1980, which is an undue burden. The Federal Rules provide that "the frequency or extend of use of the discovery methods otherwise permitted under these rules . . . shall be limited by the court if it determines that: . . . (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *Fed. R. Civ. P. 26(b)(2).* [*56] The Advisory Committee Notes state that this provision:

> address[es] the problem of discovery that is disproportionate to the individual lawsuit as measured by such matters as its nature and complexity, damages [and] the limitations on a financially weak litigant to withstand extensive opposition to a discovery program or to respond to discovery requests. . . . The court must apply the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent.

*Advisory Committee Notes, 97 F.R.D. at 218.*

Plaintiffs seek to avoid Citibank's undue burden complaint by proposing that the document search be limited to the same organizational units identified for purposes of the document production; that is, organization units, departments and individuals it has identified to have had some responsibility for, or interest in, the operation of the LATF. Moreover, the discovery request does not seek to order Citibank to conduct a survey of past or present employees, but merely to produce documents responsive to the request which may exist. Therefore, as limited by plaintiffs' suggestion [*57] described above, the request is relevant and the burden is not undue, and is therefore granted.

**F. Document Request Concerning Citibank's Fees and Income Is Premature**

Plaintiffs seek all documents relating to any fees, income or other financial benefit that Citibank derived from serving as trustee of the LATF. Plaintiffs contend such information is relevant to the subject matter of self-dealing, and expect the requested documents to show that Citibank routinely handled transactions on behalf of the LATF in a manner designed to maximize the fees and commissions it earned. Moreover, plaintiffs contend that the information is relevant to the remedy of disgorgement.

The self-dealing that might be supported by disclosing the fee arrangements, if any, should also be apparent from other documents related to the LATF which will be produced. Accordingly, this request is cumulative. Furthermore, it is appropriate to defer any discovery concerning Citibank's fees and income until liability is found, if any, and forfeiture actually becomes an issue in this litigation. This type of "phased discovery" is routinely employed. See, e.g., *Williams v. County of Sullivan,* 157 F.R.D. 6, [*58] 9 *(S.D.N.Y. 1994)* (noting that courts may phase discovery of particular issues, such as liability before damages). See also *Chambers v. Capital Cities/ABC,* 159 F.R.D. 429, 431 *(S.D.N.Y. 1995)* (phased discovery permits information to be obtained if the need to do so is established); *Guzman v. Vega,* 1993 U.S. Dist. LEXIS 18368, No. 87 Civ. 3831, 1993 WL 535543, at *1 (S.D.N.Y. Dec. 21, 1993) (approving use of limited initial discovery to determine whether factual basis exists for permitting more sweeping additional discovery).

Here, plaintiffs would not be hindered in their attempt to prove Citibank's liability if the Court does not require production of documents relating to damages until some time after liability is established. Therefore, plaintiffs motion to compel documents concerning fees and income is denied.

**G. Citibank's Indemnification Agreement With Lloyd's, If Any, Is Not Discoverable**

Plaintiffs seek disclosure of any agreements for indemnification or contribution in connection with this action claiming that such information is necessary to show bias if Lloyd's is a witness, and is relevant to the issue of self-dealing since they may show that Citibank is being reimbursed for the [*59] cost of the litigation directly from the LATF.

Citibank contends that the relationship that exists between Lloyd's and Citibank, as defined by the LATD, is, in itself, sufficient to demonstrate potential bias. Not only does Citibank, as trustee of the LATF, play a key role in the Lloyd's market, but to the extent that Citibank

could be found liable for breaching a fiduciary duty to Names by following Lloyd's express instructions pursuant to the LATD, then so too may Lloyd's be confronted with potential allegations of wrongful conduct. Therefore, the relationship between Lloyd's and Citibank will certainly be raised by plaintiffs in their effort to show bias, and the details of any indemnification agreements that may exist add nothing to that argument.

Plaintiffs' purported need for the documents to show self-dealing is not substantiated. Plaintiffs fail to show how the source of payments for this ligation are relevant to any breach of fiduciary duty relating to self-dealing. Furthermore, the documents relating the LATF which will be produced presumably will demonstrate LATF expenses, including litigation costs. Therefore, plaintiffs' request to compel discovery of indemnification [*60] or contribution agreements with Lloyd's is denied.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion to certify the class is granted, Mr. Rose and Mr. Stamm are appointed class representatives, and plaintiffs' application to appoint Ms. Rose as class representative is denied. Further, as set forth above, plaintiffs' motion to compel discovery is granted in part and denied in part.

It is so ordered.

New York, N. Y.
February 4, 1998

**ROBERT W. SWEET**

U.S.D.J.